(584 P.2d 651)
No. 49,368

BEVERLY J. TETER and INSURANCE COMPANY OF NORTH AMERICA, *Appellees*, v. JERRY L. CORLEY and HERBERT E. CORLEY, *Defendants*, and RANGER INSURANCE COMPANY, *Appellant*.

Opinion filed September 15, 1978.

*Michael R. O'Neal,* of Hodge, Reynolds, Smith, Peirce & Forker, of Hutchinson, for appellant.

*Joseph Knopp* and *Herbert R. Hess, Jr.,* of Hess, Leslie, Berkley & Granger, of Hutchinson, for appellees.

Before REES, P.J., SPENCER and PARKS, JJ.

REES, J.: This is an appeal by an insurer ("Ranger") from a determination that it afforded coverage under an automobile liability insurance policy.

On February 2, 1975, a Chevrolet automobile was involved in an accident. Beverly J. Teter, a passenger, was injured. The driver was Jerry L. Corley. The car was owned by Jerry's father, Herbert E. Corley, who had no insurance. There was in effect an automobile liability insurance policy issued by Ranger to Jerry as its named insured. Jerry's Chevrolet van was the "owned automobile" under Ranger's policy.

Beverly and the Insurance Company of North America obtained judgments against Jerry for damages resulting from the accident. They then successfully prosecuted this garnishment proceeding to satisfy the judgments. Ranger contends it afforded no coverage.

Ranger's policy provided coverage for liability arising out of use of a temporary substitute automobile. The latter is defined by the policy as follows:

" 'Temporary substitute automobile' means an automobile not owned by the named insured or any resident of the same household while temporarily used with the permission of the owner as a substitute for an owned automobile when withdrawn from normal use for servicing or repair, or because of its breakdown, loss or destruction."

Ranger has effectively conceded that Jerry's use of the car came

under its coverage as use of a temporary substitute automobile but for the definitional element of non-ownership by "any resident of the same household." Accordingly the sole issue is whether Jerry was a resident of the same household as his father on the date of the accident. The trial court held he was not. We are asked to hold as a matter of law that he was.

Review of the record discloses that the following findings of fact by the trial court aptly reflect and summarize the evidence:

"1.   On the date of the accident Jerry Corley and his wife were experiencing matrimonial difficulties. On January 5, 1975, they had come to a parting of the ways and both left the matrimonial domicile and went their separate paths. Jerry was sleeping in an assortment of places. First, he started at his sister's house until January 10, and next he slept at a tavern which he owned on South Lorraine until about January 13. Then to his Grandmother's place he went, where he had stored his furniture, leaving Grandma on January 16. The next couple of nights he spent at the tavern and then went back to his sister's home where he remained until January 25th at which time he moved in with his wife in an attempt to effect a reconciliation. This effort lasted until approximately January 31, when he moved to his father's house and spent the following two nights sleeping on the floor.

"2.   On the night of the accident, February 2, 1975, Jerry stayed all night at the hospital to which Beverly had been taken, and then he went to his grandmother's place again, staying until the 6th, when he moved to his father's home, where he stayed about a month. On March 7, he moved into a house where a girl friend stayed. Thereafter he went to his father's home until he moved to Wellington.

"3.   During his peregrinations, Jerry kept his clothes in the car and ate most of his evening meals with his folks under an arrangement with his mother to pay $2.00 per meal or $65.00 per month, with the understanding he could sleep there when he had no other place to lay his head. During this period of time, Jerry was looking for and answering want ads, looking for a place to rent.

.   .   .   .

"5.   On January 25, Jerry consulted Mr. McKibben, an agent for Ranger Insurance Company. He was accompanied by a woman, apparently his wife. Jerry told Mr. McKibben he wanted to insure his father's car, but was advised he couldn't do this but that if he wanted to insure his own car, a Chevrolet van, he would be covered if he drove his father's vehicle. At this time Jerry's address was in a state of flux and Mr. McKibben suggested he use his tavern's address and then notify him when he acquired a permanent one.

"6.   Mr. McKibben gave Jerry a receipt for the premium he paid, but no policy was delivered to the insured until demand was made after the insurance company had denied coverage."

An obvious reason lying behind Ranger's denial of coverage was that on various occasions when Ranger contacted Jerry in its investigation of the accident and the question of coverage, Jerry gave Ranger his parents' address as his address as of and at other times after the accident date. In this general regard, the trial court found:

"4. Jerry used his father's address, RFD 4, as a place for receiving mail and a place through which he could be contacted, in as much as he was taking his evening meals there."

In the trial court and before us, Ranger has taken upon itself the burden of proof to establish that Jerry and his father were residents of the same household. Having failed to do so, in the judgment of the trial court, it was held as a conclusion of law that:

"3. It has not been established that on February 2, 1975, Jerry Corley was a resident member of his father's household within the meaning of the exclusionary clause of the policy issued by Ranger Insurance Company."

The trial judge gave the parties the benefit of comments concerning his consideration of the case. He had taken into account, among other matters, statutory definitions of "residence" and "householder" (K.S.A. 77-201, *Twenty-third* and *Twenty-fifth*) as well as *Vaughn v. American Alliance Ins. Co.*, 138 Kan. 731, 27 P.2d 212 (1933), and *General Leasing Corp. v. Anderson*, 197 Kan. 327, 416 P.2d 302 (1966). Most directly he said:

". . . I believe it cannot be said that on February 2, 1975, Jerry Corley had become a 'resident member' of any household. His pattern of living was peripatetic at best: he was a foot loose wanderer, going from relative to relative, taking root nowhere.

"Nor am I able to infer an intention on his part to return habitually to his father's home. Neither before nor subsequent to February 2d, is a pattern of stability discernible."

Although not automobile liability insurance cases, *Estate of Schoof v. Schoof*, 193 Kan. 611, 612, 396 P.2d 329 (1964); *Buehne v. Buehne*, 190 Kan. 666, 676, 378 P.2d 159 (1963); *Irvin v. Irvin*, 182 Kan. 563, 566-567, 322 P.2d 794 (1958); *Gleason v. Gleason*, 159 Kan. 448, Syl., 155 P.2d 465 (1945), are authority for the rule that a determination of residence by a trial court is generally a question of fact which will be upheld on appeal when supported by substantial competent evidence. We discern no reason for the rule to be otherwise here.

The law concerning the establishment and continuance of a "residence" is well stated in *Estate of Schoof v. Schoof*, supra, as follows:

"The establishment of residence requires the concurrence of two factors: one physical, the other intellectual. There must be bodily presence at a location coupled with intent to remain there either permanently or for an indefinite period,

before residence can be said to have been acquired. A residence once established is presumed to continue until the same has been abandoned. (*Keith v. Stetter*, 25 Kan. 100; *Palmer v. Parish*, 61 Kan. 311, 313, 59 Pac. 640.) To effect a change of residence, there must be transfer of bodily presence to another place coupled with an intent to abide in the new location either permanently or indefinitely. (*Ford, Adm'x, v. Peck*, 116 Kan. 74, 225 Pac. 1054.) The length of the stay in the new abode is not of controlling importance, for no stated period of time is required to complete a change of residence; the change may be effectuated on the first day of arrival in the new location provided the requisite intent to establish residence therein be present. . . ." (193 Kan. at 614.)

In reality, two separate intentions are involved: one to abandon the old location and one to abide in the new. If the last intention be formed, it necessarily includes the first. *Arnette v. Arnette*, 162 Kan. 677, Syl. 4, 178 P.2d 1019 (1947).

We believe the definition set forth in *Estate of Schoof v. Schoof*, supra, is controlling, that is, "residence" requires two elements: (1) bodily presence at the location, and (2) intent to remain there either permanently or for an indefinite period.

A case similar to the one before us is *State Farm Mutual v. Smith*, 206 Va. 280, 142 S.E.2d 562 (1965). The insured had moved from California to Virginia to live with her sister and brother-in-law. The insured intended to live with her relatives only until her baby was born. Some eight weeks after moving to Virginia, the insured was involved in an accident while driving her brother-in-law's car which was uninsured. The determinative question was whether the insured was a resident of her brother-in-law's household on the date of the accident. In holding that she was not, the court said in part:

"The meaning of 'resident' or 'residence', a prolific source of litigation, depends upon the context in which it is used. Here, we must interpret the meaning of 'resident', when followed by 'of the same household'. The word 'household', . . . connotes a settled status; a more settled or permanent status is indicated by 'resident of the same household' than would be indicated by 'resident of the same house or apartment'. We interpret the language of the policy as excluding coverage if [the insured] had assumed a residence and become so intertwined with the [brother-in-law's] family as to become a member of that family, and as extending coverage if she was a visitor or sojourner in the [brother-in-law's] home.

"The proper conclusion to be drawn from the facts of this case is that [the insured] was a visitor or sojourner in the [brother-in-law's] home and, therefore, was driving a 'Non-Owned Automobile' at the time of the accident. She came to Norfolk for a limited period of time, limited to the remaining period of her pregnancy. . . ." (206 Va. at 285-286.)

Another similar case is *Goens v. Arinder,* 248 Miss. 806, 161 So. 2d 509 (1964). The issue there was whether a daughter of the insured was a "relative of the named insured who is a resident of the same household." (p. 811.) A daughter and her husband were living with the insured pending the completion of their own home and the birth of the daughter's baby. They had moved some of their furniture, including a bed, washing machine and refrigerator, into the insured's home. They slept in the insured's home and took their meals there. In concluding the daughter was not a resident of her father's household at the time of the accident, the Mississippi Supreme Court said in part:

"The word 'resident' means one having more than physical presence. The transient visit of a person for a time to a place does not make him or her a resident while there. The word 'resident' imports a fixed abode for the time being, as distinguished from a place of temporary abode or a temporary sojourn. 77 C.J.S., pp. 305-307. In the instant case, the [daughter and her husband] were building a home into which they had already moved part of their furniture, and were simply visiting or sojourning for the time being in the [insured's] house, until [the daughter] could have a baby and their house was completed. Hence she was not a resident of the [insured's] household within the meaning of the exclusion clause (1)(b). State Farm's contention to this effect is contradicted by the facts." (248 Miss. at 811.)

*Simon v. Milwaukee Automobile Mutual Ins. Co.,* 262 Minn. 378, 115 N.W.2d 40 (1962), relied upon heavily by Ranger, is clearly distinguishable. There the insured had resided in his father's home for a period of several years prior to the accident. On the date of the accident the insured had not yet relocated to a new residence where he intended to live in the future. Not having established bodily presence at the new residence, no change of residence from his father's home had yet been effected.

There is ample evidence that Jerry never established a residence at his father's home and was only temporarily present there.

Ranger argues the temporary substitute automobile coverage was not meant to apply to the type of use of a non-owned vehicle present in this case. Relying upon case law construing so-called "drive other cars" clauses in automobile insurance policies (*Aler v. Travelers Indemnity Co.,* 92 F. Supp. 620 [D. Md. 1950]; *Leteff v. Maryland Casualty Company,* 91 So. 2d 123 [La. App. 1956]), Ranger argues that the continued and unfettered use of his father's automobile by Jerry is not the type of use covered by the

policy. Reference is made to evidence that Jerry had been driving his father's car on a regular basis for one or two weeks prior to the accident and intended to continue doing so for several weeks after the accident. It is urged that such continued and unfettered use of a non-owned automobile is the very situation sought to be avoided in basic automobile insurance policies.

Ranger's argument overlooks the difference between a "drive other cars" clause and a temporary substitute automobile provision. The purpose of a "drive other cars" clause is to extend the driver's regular insurance to casual driving of cars other than his own without the payment of additional premium. In order to confine the extended risk to such casual driving the coverage is made inapplicable to the driving of other cars usually at hand and regularly used. *General Leasing Corp. v. Anderson,* supra, at 330.

Ranger's policy contains typical temporary substitute automobile provisions. Coverage is afforded while the substitute vehicle, not owned by the insured, is being temporarily used in place of an insured vehicle withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction. The purpose is not to narrow or defeat liability but to reasonably define coverage by limiting the insurer's risk for non-casual driving to one operating vehicle at a time for a single premium. 12 Couch on Insurance, 2d, § 45:219, p. 261; *State Farm Mutual Automobile Insurance Company v. Lietz,* 122 Ga. App. 596, 598, 178 S.E.2d 218 (1970); *Nelson v. St. P. Merc. Ins. & Clark et al,* 83 S.D. 32, 38, 153 N.W.2d 397 (1967).

Though we deem it unnecessary to our decision, it may be noted that it has been held in other jurisdictions that a substitute automobile provision in an automobile liability insurance policy is for the insured's benefit and is to be construed liberally in favor of the insured if any construction is necessary. *Insurance Co. v. Insurance Co.,* 279 N.C. 240, 182 S.E.2d 571 (1971); *Gabrelcik v. National Indemnity Co.,* 269 Minn. 445, 447, 131 N.W.2d 534 (1964).

There was substantial competent evidence to support the trial court findings and conclusion that Jerry and his father were not residents of the same household.

Affirmed.