No. 57,589

David M. Friedman, *Appellee*, v. Alliance Insurance Company, Inc., *Appellant.*
(729 P.2d 1160)

Opinion filed December 5, 1986.

*Arthur S. Chalmers*, of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause, and *Larry A. Withers*, of the same firm, was with him on the briefs for appellant.

*Walter G. Williamson*, of Williamson, McGee, Griggs, & DeMoss, Chartered, of Wichita, argued the cause, and *Broc E. Whitehead*, of the same firm, was with him on the briefs for appellee.

The opinion of the court was delivered by

MILLER, J.: This is an action by David M. Friedman against Alliance Insurance Company, Inc., seeking payment for a theft loss under his parents' homeowners policy. The trial court, at the close of a bench trial, determined that Friedman was covered under the policy and awarded plaintiff judgment for the total amount of his claim, $9,143.30, plus attorney fees and certain prejudgment interest. Alliance appealed, and the Court of Appeals, in an unpublished *per curiam* opinion, affirmed, with the exception that it modified the date upon which the prejudgment interest began. The Court of Appeals also allowed additional attorney fees of $500 for the appeal. Alliance petitioned this court to review the judgment of the Court of Appeals, and Friedman also petitioned this court to review the allowance of attorney fees on appeal, contending that the amount awarded was insufficient. We granted review. The controlling issue is whether Friedman was a resident of his parents' household at the time of the loss, June 7, 1983.

Friedman's parents reside at 641 North Woodlawn, Wichita, Kansas, and Friedman regarded that as his residence. He had a key to the premises, had his own room there with some of his personal belongings, filed Kansas and federal tax returns giving that address as his residence in 1983, maintained his checking account in Wichita, and licensed his car there. His parents had a homeowners policy with the defendant providing, under Coverage C, insurance on personal property up to the limit of $100,000. Pertinent policy provisions are as follows.

"DEFINITIONS

. . . .
    "3. 'insured' means you and the following residents of your household:
        a. your relatives;

        . . . .
    "4. 'insured location' means:
        a. the residence premises;

        . . . .
        d. any part of a premises not owned by any insured but where any insured is temporarily residing . . . ."
"SECTION 1 - COVERAGES
"Coverage C Personal Property
    "We cover personal property owned or used by any insured while it is anywhere in the world. . . . Our limit of liability for personal property usually

situated at any insured's residence, other than the residence premises, is 10% of the limit of liability for Coverage C, or $1000, whichever is greater. Personal property in a newly acquired principal residence is not subject to this limitation for the 30 days immediately after you begin to move the property there."

"SECTION 1 - PERILS INSURED AGAINST

. . . .

"9. Theft, including attempted theft and loss of property from a known location when it is likely that the property has been stolen.

. . . .

"This peril does not include loss caused by theft that occurs away from the residence premises of:

a. property while at any other residence owned, rented to, or occupied by any insured, except while any insured is temporarily residing there. Property of a student who is an insured is covered while at a residence away from home if the student has been there at any time during the 45 days immediately before the loss.

b. unattended property in or on any motor vehicle or trailer, other than a public conveyance, unless there is forcible entry of the vehicle while all its doors, windows and other openings are closed and locked and there are visible marks of the forcible entry; or the vehicle is stolen and not recovered within 30 days."

"THEFT COVERAGE EXTENSION

"For an additional premium, we insure for direct loss caused by theft of covered personal property away from the residence premises while unattended:

a. in or on any motor vehicle or trailer;

. . . .

All other provisions of this policy apply."

In 1983, Friedman attended the University of Texas at Austin, where he lived in an apartment. Sometime in May 1983, he attended graduation services but he did not receive his degree because he had a geology field trip to take in order to complete work for his degree. He completed this work at the end of May 1983. He received his diploma from the university in August 1983.

Prior to graduation, he accepted a job with CGG American Services, Inc., an oil and gas exploration company. He was to report to company offices in Mobile, Alabama, on June 7, 1983. On June 6, 1983, he departed from Austin, taking with him all of the furnishings from his apartment and most of his personal possessions in a U-Haul trailer attached to his car. He arrived in Mobile that evening and stopped at a motel for the night. The trailer was locked. Some time in the early morning hours of June 7, persons unknown broke into the trailer and took all of Friedman's personal property. Friedman immediately reported the

break-in to the police; nothing has been recovered. He reported to CGG for work on June 8, 1983. Friedman's father filed a claim with Alliance for $9,143.30, and Alliance refused the claim for the reason expressed in its letter to him, as follows:

"[S]ince your son had a job in Mobile, Alabama when he moved there, our company's position is he would no longer be a resident of your household.

. . . .

"Under your policy, the only property covered would be your property or a resident of your household's property. Since it would appear that your son had no intention of returning to Wichita and was going to follow his job until it led to something in the Houston area, we do not feel that your policy would extend coverage to him."

At the time the loss occurred, Friedman was in the process of moving from his apartment in Texas to Alabama. He had not reported for work and had not yet moved any of his belongings out of the trailer and into a home or apartment. The loss occurred just seven days after the completion of his work at the university. In regard to his residence, he testified that during this period of time he considered his parents' home in Wichita as his residence. He testified in part as follows:

"Q. At the time you were in Mobile, Alabama, on June 7th, 1983, you didn't have any intention to return to your parents' house to live at that address permanently or for an indefinite period of time, did you?

"A. That's not true. That was a distinct possibility. In fact, I actively sought employment here in Wichita before my graduation; and this February, when I was between jobs, I had sought employment here.

. . . .

"Q. Your intention then, as you phrase it, to return to your parents' house and stay there permanently or for an indefinite period of time, that was a possibility if the CGG American Services job didn't work out?

"A. That's correct.

"Q. And when you went there the day before you were to report for the job, you had no expectation that that job wouldn't work out, did you?

"A. I knew that it would not be permanent because the job market was very tough when I got out of school, but I had every intention of getting as much experience as I could.

"Q. You were going to get that job, big push to make it work, if you could?

"A. That's correct."

The job Friedman was about to commence with CGG would entail considerable traveling and moving about. He hoped to wind up living in either Houston or Wichita. He had not reported for work, had not rented an apartment in Mobile, and was very much in the process of moving at the time the loss occurred. The

trial court held that Friedman's residence was with his parents on the day of the loss. The court said:

"The day he went away to college, I suppose, he hoped to be able to eventually establish a separate place of abode, which would become his residence and where he would sever for once and for all the ties with his parents and parental home. That was still his state of mind when he got in his car in Austin on a day or two before June 7th and headed for Mobile, Alabama. But he—there was no place yet to which wherever he went he always intended to return other than his parents' home in Wichita.

". . . His intent on that day was if all else failed—was to go back to North Woodlawn in Wichita, Kansas, 641, where his parents were. . . .

"[T]he residence once established is presumed to continue until another one is clearly established."

The court then discussed *Teter v. Corley*, 2 Kan. App. 2d 540, 584 P.2d 651 (1978), and concluded:

"David Friedman was not a footloose wanderer. He knew where his root was, and it was at 641 North Woodlawn, Wichita, Kansas; and he had never had another residence. . . .

"I can't find any justification for the failure of the insurance company to settle this case. I think they seized upon the fact that he had taken a job to place the entire weight of this case on; and it just isn't going to work."

Judgment was entered in favor of Friedman and against Alliance. The Court of Appeals, in affirming the trial court, said:

"The scope of our review is to determine if the findings below are supported by substantial competent evidence and are sufficient to support the resulting conclusions of law. *Woods v. Midwest Conveyor Co.*, 236 Kan 734, 697 P.2d 52 (1985). If so found, a determination of residence will be upheld on appeal. *Teter v. Corley*, 2 Kan. App. 2d 540, 542, 584 P.2d 651 (1978). In this case, however, we believe the question becomes one of law only because the facts as to residence were not disputed. See *Ramsey v. KFB Ins. Co.*, 237 Kan. 86, 697 P.2d 863 (1985), where the determination to be made was who were 'members of a household.'

"With the scope of appellate review in mind, we turn to the relevant policy provisions [as set forth above]:

. . . .

"As stated in *Teter*, 2 Kan. App. 2d at 543, the term ' "residence" requires two elements: (1) bodily presence at the location, and (2) intent to remain there either permanently or for an indefinite period.' See also *Palmer v. Parish*, 61 Kan. 311, 313, 59 Pac. 640 (1900), holding that a residence once established—in the present case, the Wichita residence—is presumed to continue until the same has been abandoned. This holding was approved in *Estate of Schoof v. Schoof*, 193 Kan. 611, 614, 396 P.2d 329 (1964). There was no evidence that Friedman intended to stay at the motel either permanently or indefinitely. To the contrary, his intent to stay at any location in Mobile was definite in duration: three weeks.

"It follows that there was no error in the determination that Friedman had not abandoned his former residence and, as a relative of his parents, he was an

insured person under the policy. Furthermore, and while not relied upon by the trial court, we conclude there is adequate additional language in the policy to cover this loss because of the 30-day provision: [quoting the language from Section I - Coverages—Coverage C Personal Property, as set forth above]. This provision makes Alliance's defense shallow indeed because it is based upon the claim that Friedman had established a new residence in Mobile. If that claim were true, this loss still would be covered by the policy for 30 days after he abandoned the Wichita residence."

Alliance contends that the trial court and the Court of Appeals improperly applied the presumption that a residence once established continues until it is abandoned, because this presumption is a product of jurisdiction cases. We have held that while "domicile" and "residence" are substantial equivalents when jurisdiction or venue is at issue, there is a distinction for many legal purposes. *Estate of Schoof v. Schoof*, 193 Kan. 611, 613-14, 396 P.2d 329 (1964). That case involved the question of venue. We said:

"The establishment of residence requires the concurrence of two factors: one physical, the other intellectual. There must be bodily presence at a location coupled with intent to remain there either permanently or for an indefinite period, before residence can be said to have been acquired. A residence once established is presumed to continue until the same has been abandoned." 193 Kan. at 614.

Apparently, this court has never interpreted "resident" as used in the phrase "resident of the [named insured's] household" in an insurance policy. Although the phrase "the named insured or a member of the same household" was used in the policy involved in *Ramsey v. KFB Ins. Co.*, 237 Kan. 86, 87, 697 P.2d 863 (1985), it was undisputed that the son and his parents were members of the same household (see 237 Kan. at 88), and the decision did not turn on an interpretation of that phrase.

Many cases involving "resident" or "member" of the household are cited by industrious counsel and many may be found in Annot., Who is "Resident" or "Member" of Same "Household" or "Family" as Named Insured, Within Liability Insurance Provision Defining Additional Insureds, 93 A.L.R.3d 420, and the 1986 Supplement to that volume. These cases involve children who are away at college or are away taking specialized training, children who have moved out of the home and are living apart for one reason or another, children of divorced parents who are living in the home of one parent when the claim arises, children in the military service, children working and living away during

the week but returning on weekends, unemancipated minors who live with relatives, and all of the infinite variety of factual situations which may arise. None of the cases cited by counsel and none we have found, however, involve facts similar to those at hand—where the child has completed college and is in transit and in the process of moving when the loss occurs.

Clearly, Friedman's property was insured under the theft provisions of the policy while he was a student. Even without specific policy provisions, the cases indicate that, generally, children who are living away from home while attending educational institutions remain residents of their parents' homes for policy purposes. See Annot., 93 A.L.R.3d 420, 446, § 8.

A helpful opinion is that written by the distinguished Utah jurist Justice A. H. Ellett, in *American States Ins. Co., Western Pac. Div. v. Walker*, 26 Utah 2d 161, 486 P.2d 1042 (1971). He concisely sets out the facts and the court's rationale as follows:

"Dixie Ann went away to college during the school years 1965-66 and 1966-67, where she was studying to go into the field of education. She considered herself a resident of her father's household all during this time and returned to his home in Idaho Falls, Idaho, at the end of each school year. After two years of college study, she decided to become an X-ray technician and came here to Salt Lake City, Utah, to receive her training in a local hospital. She lived at the hospital for approximately four months until she had to move to make room for some student nurses, and thereafter she lived in an apartment with some other girls. She opened a joint bank account here with her father and had a telephone listed in her own name. She was born July 23, 1947, and was just under 21 years of age on May 30, 1968, the date when the accident in question happened. While in training as an X-ray technician she was paid a salary of approximately $140 per month take-home pay. Her parents augmented her income by giving her small amounts of money, clothing, and food when she would return home on visits. At all times prior to the date of the accident she kept some furniture, her books, and her clothing in her father's home. She considered herself a resident of Idaho and voted in the general election there in November 1968. She had a driver's license issued by the State of Idaho but none by Utah. As opposed to the foregoing, the insurance company points out that when she filed her 1968 income tax return, she listed her residence for the year as being in Utah.

"With this evidence before him, the trial court held on May 30, 1968, Dixie Ann Walker was a resident of her father's household. It is our duty to affirm him if there is any substantial evidence to sustain that ruling.

"[1] A resident of a household is one who is a member of a family who live under the same roof. Residence emphasizes membership in a group rather than an attachment to a building. It is a matter of intention and choice rather than one of geography.

"[2] Ordinarily when a child is away from home attending school, he remains a member of the family household, and the question of when he ceases to be such

is one which must be determined from all of the facts and circumstances as revealed by the evidence.

"[3] The trial court heard the evidence and made a finding that at the time of the collision Dixie Ann Walker was still a resident of her father's household. Whether we would have made the same ruling had we tried the case is immaterial, and on appeal we are not justified in substituting our judgment for his, since the evidence was such as to sustain his judgment.

"The ruling made is further buttressed by the testimony to the effect that Dixie Ann and her father went to the agent of the insurance company for advice as to whether an additional insurance policy should be taken out to cover her when she left Idaho for training in Utah. The agent told them that she would be covered by her father's policy." 26 Utah 2d at 163-64.

While the facts in *Walker* differ from those here, we fully agree with the statements made in paragraphs [1] and [2] of the opinion. Whether one who has been a "resident of the [named insured's] household" has ceased to be such is a question to be determined from all of the facts and circumstances.

"Residence," as used in Kansas statutes, is defined by K.S.A. 1985 Supp. 77-201, *Twenty-third*:

" 'Residence' means the place which is adopted by a person as the person's place of habitation and to which, whenever the person is absent, the person has the intention of returning. When a person eats at one place and sleeps at another, the place where the person sleeps shall be considered the person's residence."

"Resident" is defined by Webster's Third New International Dictionary of the English Language, Unabridged, p. 1931 (1964), as "one who resides in a place: one who dwells in a place for a period of some duration."

"Household" is defined in the same work as "those who dwell under the same roof and compose a family: a domestic establishment; *specif*: a social unit comprised of those living together in the same dwelling place." p. 1096. The court focused upon that definition in *Schehen v. North-West Insurance*, 258 Or. 559, 484 P.2d 836 (1971), holding that a daughter who remained with her children in the home she had shared with her parents was no longer a resident of her father's household after her father and mother moved to another city.

A reasonable definition of a resident of a household would seem to include those persons who physically reside in the household and those who are temporarily absent. Applying that definition to the facts of a particular case, however, must be done on a case-by-case basis.

It would be helpful to list the various factors which the courts

have relied upon in determining whether a child is a resident of the parents' household, or has ceased to be a resident thereof. These factors, while not intended to be all-inclusive, include the following:

1) The child's intent;
2) the child's bodily presence in the home;
3) whether there exists a second place of lodging, a second address, and if so, the relative permanence or transient nature thereof;
4) the child's relationship with the parents;
5) whether the child has a key to the home, his or her own room, and personal belongings there;
6) whether the child is self-supporting;
7) whether a new residence has been established;
8) where one votes, gets mail, pays taxes, registers vehicles, banks, and has permanent ties, and
9) the length of time the child has actually resided in the home; the permanency of the living arrangements.

Friedman hoped to make a success of his new job—but he had not entered into it at the time of the loss. If, when he reported for work on June 7 as planned, the job no longer existed, if he found he could not work there, or if the job did not work out, he had but one place to go: home to Wichita. At the time of the loss he still considered himself a resident of his father's house. He had engaged a motel room for the night; he had not established a residence in Mobile. He had not been in the Wichita home recently, so far as the record indicates, but so long as he was a student living in the Austin apartment he remained a resident of his father's household for coverage purposes. We see no difference in his leaving Austin and heading for Mobile than if he had returned to Wichita and left from there for Mobile. He was in transit, in the process of moving, when the loss occurred.

He had a temporary place of lodging—the motel—but that had no permanence. His relationship with his father was close and cordial. He relied upon him for advice on financial and social matters, and his first moves after discovering the loss were to call the police, and then to call his father. He had a key to his parents' home; had his own room; had furniture, clothing, and personal items there; filed income tax returns giving his Wichita address; registered for the draft and to vote in Wichita; maintained his

bank accounts there; and drove a vehicle titled in his and his father's name and insured under his father's policy.

Friedman had been employed during the summer, but there is no evidence as to whether he worked during the school year or whether he was self-supporting at the time of the loss. Since that time he has been fully employed, but his income and his activities since the loss have little bearing upon his residence *at the time* the loss occurred.

Where, as here, the trial court has made findings of fact and conclusions of law, the function of this court on appeal is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. *Holly Energy, Inc. v. Patrick*, 239 Kan. 528, Syl. ¶ 2, 722 P.2d 1073 (1986). Upon a thorough review of the evidence, we conclude that there is substantial competent evidence to support the finding of the trial court that Friedman was a resident of his father's household at the time of the loss, and such finding supports the trial court's conclusions of law and the judgment entered.

The next issue is whether the trial court erred in allowing attorney fees to the plaintiff. The Court of Appeals held that there was no error, saying:

"Turning to the allowance of attorney fees, we note that the amount of the allowance is not raised as an issue. Alliance's only claim is that there is a genuine and good faith question that it refused without just cause or excuse to pay the claim, thus making the allowance unauthorized by the specific language of K.S.A. 40-256.

"Just cause or excuse is to be determined as of the time a claim is denied, judging the circumstances 'as they would appear to a reasonably prudent man having a duty to investigate in good faith' and determine the facts of the controversy. *Watson v. Jones*, 227 Kan. 862, 871, 610 P.2d 619 (1980); *Brown v. Continental Casualty Co.*, 209 Kan. 632, 498 P.2d 26 (1972); *DiBassie v. American Standard Ins. Co. of Wisconsin*, 8 Kan. App. 2d 515, 661 P.2d 812 (1983).

"Successful prosecution of a suit by an insured does not necessarily result in entitlement to attorney fees because they are properly denied if there is a good faith legal controversy as to liability. *Harper v. Prudential Ins. Co. of America*, 233 Kan. 358, 372, 662 P.2d 1264 (1983). In this case, however, we believe the allowance comes within the law of trial court discretion. See *Farm Bureau Mutual Ins. Co. v. Carr*, 215 Kan. 591, 598, 528 P.2d 134 (1974), and *DiBassie*, 8 Kan. App. 2d at 523. As stated earlier, we view Alliance's claim of no liability as shallow. Even so, Alliance argues that this case is one of first impression and the novelty of the case constitutes just cause for denial of the claim. Novelty alone, however, does not necessarily support a just cause refusal to pay the claim. See

*Estate of Bingham v. Nationwide Life Ins. Co.*, 7 Kan. App. 2d 72, 80, 638 P.2d 352 (1981), *aff'd as modified* 231 Kan. 389, 646 P.2d 1048 (1982).

"Friedman maintains this case falls within the specific language of *Bingham*, which states Nationwide took a 'strained position . . . as to how it interpreted the policy it wrote.' *Bingham*, 7 Kan. App. 2d at 80. A more accurate observation in this case would seem to be that Alliance never considered the uncontroverted facts in light of its policy provisions which no one has claimed were in any way ambiguous. We find the allowance was a proper exercise of trial court discretion . . . ."

The company's denial of coverage was based on the new job Friedman had "taken"—although he had not yet gone to work—and his lack of intention to return to Wichita— although Friedman told the company's investigator that his parents' home was his permanent residence. Also, Friedman was no longer a student and the special policy provisions relating to students were inapplicable. Alliance questioned whether or not there was coverage under the policy. The trial court found that Alliance did not have just cause or excuse to refuse to pay the loss, K.S.A. 40-256, and awarded attorney fees. The Court of Appeals affirmed. Upon a careful review of the record, however, and particularly in view of the dearth of cases involving similar factual situations, we hold that there was a good faith question of coverage in this case and, therefore, refusal to pay the claim was not without just cause. Where there is a genuine issue, raised in good faith, the insurer should be able to litigate it without being subject to paying counsel fees under this statute. The award of attorney fees cannot stand.

The trial court also awarded prejudgment interest on that portion of the claim ($6,643.30) which was undisputed. The Court of Appeals affirmed, modifying the judgment only to have the interest computed from the date the claim was filed, August 31, rather than the date of the loss, June 7. Alliance stipulated, at the opening of trial, that the values claimed were correct. That amount not being in dispute, that portion of the claim is liquidated, and the allowance of prejudgment interest was proper. See *Leader Clothing Co. v. Fidelity & Casualty Co. of N. Y.*, 237 F.2d 7 (10th Cir. 1956) (applying Kansas law), and *Mitchelson v. Travelers Ins. Co*, 229 Kan. 567, 573, 629 P.2d 143 (1981).

The judgment of the Court of Appeals is affirmed except for the award of attorney fees, which is reversed. The judgment of the trial court is modified as to the date prejudgment interest is to

commence, August 31, 1983; it is reversed as to the allowance of attorney fees; and, otherwise, it is affirmed.

LOCKETT, J., concurring and dissenting: I concur with the majority opinion which affirms the judgment for loss of the insured's personal property. The logic of the majority reversing the award of attorney fees under K.S.A. 40-256 requires me to dissent.

The majority states that just cause or excuse is to be determined as of the time a claim is denied, judging the circumstances as they would appear to a reasonably prudent man having a duty to investigate in good faith and determine the facts of the controversy. It asserts that even if it is a question of first impression novelty of the question alone does not constitute just cause for denial of a claim.

The majority ignores the record and the evidence which caused the trial court to determine that Alliance did not have just cause or excuse to refuse to pay the loss.

The loss occurred June 7, 1983. Friedman notified both the authorities and insurance agency of the loss on that day. Alliance did not commence an inquiry into the claim until September 22 when it took Friedman's statement. Alliance notified Friedman that the loss was not covered by its policy by a letter dated September 23. Alliance based its decision to deny coverage on a review of court decisions listed in F.C.& S. Bulletins (1-80).

By letter of September 28, Hiebert Insurance Associates, Inc., indicated that it had reviewed the court decisions contained in the bulletins and determined that the loss was covered. Alliance was urged to reconsider its decision.

Because Alliance had not taken action on his claim, Friedman filed a complaint with the Insurance Commissioner's office, which then contacted Alliance. Alliance answered the inquiry from the Commissioner's office stating that it had denied coverage based on its review of court decisions in F.C.& S. Bulletins (1-80). After reviewing Alliance's answer, the Insurance Commissioner's office determined that Alliance had failed to diligently investigate the claim and that Alliance should not rely on the cases stated in the bulletins to deny coverage. It notified Alliance of its finding by letter dated November 18, 1983.

The first paragraph of the letter states:

"Thank you for your report and prompt reply in answer to the insured's complaint on the above subject file. As a passing remark to the comments which

"follow, a review of the file information in this matter does not provide the same degree of responsiveness in the investigation. Notice to both the authorities and agency was given on the occurrence date of June 7, but the file does not reflect any positive investigation activity until David Friedman's statement was obtained in late September. Neither does the report address contractual aspects associated with the circumstances preceding the occurrence, and their relationship to the loss."

The letter stated the facts in this case. It then noted that the bulletin Alliance relied on to deny coverage stated "that courts construe these provisions *favoring coverage* whenever reasonably possible." Next the letter contained a review of 26 cases which considered the issue. There were 18 cases dealing with automobile coverage forms. Of these 18 cases, 15 determined that the loss was covered. Under homeowner/property-style insurance forms, eight decisions were cited, five of which found that there was coverage. The letter then stated:

"However, as previously mentioned, we do not feel that an examination of the above reference material considers all of the factors that are present in the subject case. Not only are none of the quoted cases on point, neither does any of the current information address the terms, conditions, and provisions that are found in the present homeowners contract."

Finally, the letter listed other bulletins for Alliance to review.

Alliance still denied coverage. The policy holder was required to file a lawsuit to recover his loss. Both the trial court and the Court of Appeals found that under the facts of this case Alliance's denial of coverage was not justified under the law.

If this court has the right to weigh the facts and retry the case, then Alliance wins because there is no higher state trial court. If we are bound by the rules of appellate review contained in the majority opinion, the decisions of the trial court and the Court of Appeals must be affirmed.

I must respectfully dissent.