No. 58,759

IN THE MATTER OF THE MARRIAGE OF RAYMOND E. ADAMS, JR., *Appellee*, and SANDRA SUE DUBLIN ADAMS, *Appellant*.

(729 P.2d 1151)

Opinion filed December 5, 1986.

*Ann L. Hoover*, of Sloan, Listrom, Eisenbarth, Sloan & Glassman, of Topeka, argued the cause, and *Louis F. Eisenbarth*, of the same firm, was with her on the briefs for appellant.

*Herbert A. Marshall*, of Marshall, Davis, Bennett & Hendrix, of Topeka, argued the cause, and *Robert J. Perry*, of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

HOLMES, J.: Sandra Sue Dublin Adams (Sandra) appeals from a decision in a divorce proceeding upholding the validity of an antenuptial agreement between her and her husband, Raymond E. Adams, Jr. (Raymond). Appellant asserts the agreement is invalid and seeks a new trial on the issues of alimony (maintenance) and division of property.

The trial court, in its memorandum opinion, stated the facts as follows:

"Respondent, Sandra Sue Dublin Adams, 49, and petitioner, Raymond E. Adams, Jr., 53, were married in Maple Hill, Kansas, on December 18, 1976. The parties signed an antenuptial agreement on December 18, 1976, during the hour preceding the wedding ceremony. The agreement was signed at the petitioner's ranch office near the home where the wedding ceremony was held.

"Prior to their courtship respondent and petitioner and their respective spouses were acquainted for some period of time. Respondent knew in a general way the substantial nature of the petitioner's holdings which he acquired by way of inheritance from his parents and by his own business and cattle ranching endeavors.

"Respondent, a talented and experienced real estate agent, though self-sufficient, held no significant interests or holdings of financial value and was supporting her children from her previous marriage.

"Early on in the courtship, in August of 1976, the petitioner made it clear to respondent that he would not remarry anyone unless they signed an antenuptial agreement, stating that he wished to protect his children from his previous marriage. This upset the respondent, and she advised petitioner that she did not like such agreements and did not want to sign one.

"The parties continued to see each other and in October, 1976, set their wedding date for December 18, 1976. The wedding arrangements progressed quite well; respondent traveled to Kansas City on October 9, 1976, and picked out wedding rings. Arrangements for her children's schooling were made; respondent terminated her business affairs in New Mexico and moved to Kansas around December 11, 1976, and professional packers assisted in the move. Caterers were hired, wedding clothes were selected, invitations were sent, a special cake was ordered, the honeymoon arranged; truly the wedding was fully and carefully planned, ready to proceed . . . meanwhile legal arrangements were not proceeding so proficiently.

"On December 7, 1976, prior to respondent's move to Kansas, she received a telephone call from the petitioner who indicated he was calling from his attorney's office in Wichita, Kansas and that he was having the attorney draft an antenuptial agreement. Respondent voiced her objection to signing any agreement. Petitioner indicated that the agreement would be sent to respondent's attorney in New Mexico. Respondent contacted her attorney in New Mexico advising him of the situation and consulting with him. The New Mexico attorney had already been contacted by petitioner's Kansas attorney.

"Subsequently, petitioner traveled to New Mexico and he and respondent met with respondent's attorney. Petitioner was advised respondent did not accept the

agreement. Petitioner and respondent did not discuss the matter any further at that time. Respondent left for Kansas to live with her prospective mother-in-law prior to the wedding but before doing so contacted her attorney and asked him to draft her version of an antenuptial agreement for the parties indicating that she objected to antenuptial agreements but would sign one. He was to send a draft to her and the petitioner.

"Respondent arrived in Kansas one week before the wedding, stayed at her prospective mother-in-law's home and finalized the wedding arrangements. The subject of antenuptial agreement was not brought up again between the parties until the wedding day.

"On that day, within one hour from the time that the wedding was to commence, petitioner arrived at his mother's home where respondent was staying and getting dressed for the wedding. He asked her to accompany him to his office, a short distance away, to sign an antenuptial agreement and he indicated once again that unless there was an agreement there would be no wedding. Respondent was upset, but accompanied petitioner to his office. She examined and freely and voluntarily executed the antenuptial agreement along with the petitioner in the presence of a witness.

"Respondent signed the agreement, although she opposed the whole idea of the agreement in itself, and possibly some of the terms thereof.

"The agreement signed was a copy of the initial agreement proposed by the petitioner but initially rejected by the respondent which was the only document available at the time. Each party knew and understood the contents of the agreement and believed it was binding upon them and the marriage at the time it was signed. Each party had undergone a prior divorce and understood the legal significance of the document. Each party had prior business experience and was astute in financial dealings.

"The consequence of not signing the agreement was clear to the parties, first as to how marriage affected their property rights and secondly the consequence that if it was not signed, petitioner's obvious and long known position that there would be no wedding would come true.

"The wedding was held, and the couple left for a short honeymoon. Respondent's proposed antenuptial agreement, prepared by her attorney in New Mexico, arrived in the mail shortly thereafter. It was generally similar to the one executed by the parties prior to the marriage."

The facts recited by the trial court are, for the most part, supported by substantial competent evidence. The court then went on to state:

"After careful consideration of the evidence and particularly the circumstances of the parties at the time of the making of the agreement and its provisions, the court finds that the agreement should be upheld and enforced.

"The court finds that the agreement was fairly and understandably made. Respondent knew generally of the nature and extent of the petitioner's wealth. Considering her situation at the time of the marriage, the agreement which she made guaranteed her lifelong security and comfort. Through her, this extended to the children she supported. The agreement also protected the inheritance of the petitioner's children.

"The court further finds that there is no evidence to substantiate a claim of fraud and overreaching. Petitioner's good faith is evidenced further by his voluntarily purchasing one million dollars of life insurance payable to the respondent after the marriage and his voluntary financing of her children's support and higher education.

"The court further finds the agreement was not void as to public policy and did not encourage separation. Their situation was such that, each being married before with children from those marriages, an antenuptial agreement was appropriate to protect all parties' interests. The terms of the agreement are such that each party had something to lose should the parties separate.

"The agreement therefore, being just and equitable, fairly and understandably made and not reached by fraud or overreaching is upheld and shall prevail as to the provisions contained therein.

"IT IS SO ORDERED."

Before turning to the specific issues herein, we deem it advisable to iterate certain general principles applicable to this type of action. In *Matlock v. Matlock*, 223 Kan. 679, Syl. ¶ 1, 576 P.2d 629 (1978), we held:

"The general rule in this state is that contracts, made either before or after marriage, the purpose of which is to fix property rights between a husband and wife, are to be liberally interpreted to carry out the intentions of the makers and to uphold such contracts where they are fairly and understandably made, are just and equitable in their provisions, and are not obtained by fraud or overreaching. Generally speaking, such contracts are not against public policy, although a different rule obtains where the terms of the contract encourage a separation of the parties."

*Herman v. Goetz*, 204 Kan. 91, Syl. ¶ 3, 460 P.2d 554 (1969), provides:

"In determining whether an antenuptial contract should be sustained, unreasonable inadequacy of a provision for the intended wife, or disproportion of the share she will receive, cannot be concluded from the contract alone but can only be determined from a consideration of all the circumstances. Not only is the amount of the husband's property a factor—consideration should be given to the situation of the parties, as compared to each other, their respective property, their family ties and connections, and the whole circumstances leading up to the execution of the contract and their marriage, the question in the end being whether, in view of all the facts, the intended wife was overreached."

The agreement entered into by the parties provided in paragraphs one and two that each party would retain his and her separate property and absolute control over it to the same extent as if the parties were not married. Paragraph three stated Raymond was not relieved of his legal duties to support Sandra during the marriage relationship. Paragraph five covered the distribution of property in the event of the death of either party,

six covered after-acquired property, and seven provided that the agreement was binding upon the parties' successors and legal representatives. Paragraph four, which is directly involved in these proceedings, states:

"4. In the event of the separation or divorce of the parties, Adams shall pay unto Frizell [Sandra] the sum of Twenty-four Thousand Dollars ($24,000) within 30 days after the earlier of said events, and the sum of Twenty-four Thousand Dollars ($24,000) on each anniversary date thereof, until the earlier of 1) the death of Adams, 2) the death of Frizell, 3) the remarriage of Frizell, or 4) the date of mutual agreement of the parties to recommence living together as husband and wife. It is agreed that the provisions of this paragraph 4 shall be in lieu of and in full satisfaction of all claims for alimony, both temporary and permanent, attorneys' fees or any other interest to which Frizell would otherwise be entitled in the event of a separation or divorce of the parties."

Additional facts will be stated as necessary in determining the issues raised by the appellant.

Appellant raises several issues, the first being that the antenuptial agreement is invalid and that the court abused its discretion in its decision. She contends the decision is contrary to the evidence in that (1) it was obtained through fraud and over-reaching; (2) it was not fairly and understandingly made; and (3) it violates public policy. The evidence concerning the various discussions by the parties between the summer of 1976 until the wedding in December, relative to the execution of an antenuptial agreement, was hotly disputed. Sandra testified it was only mentioned a couple of times and on each occasion when she stated she did not want to sign an antenuptial agreement, Raymond would "back off" and state it wasn't important. Raymond, on the other hand, testified he had made it clear from the beginning there would be no marriage unless there was an agreement. Both parties had obtained divorces in 1976 and both were still acutely aware of the results of such proceedings. Sandra also contended that at the time she signed the contract Raymond promised to change the agreement upon their return from the honeymoon. Raymond denied ever having discussed any changes in the agreement or that he had stated it would be changed. Sandra testified she was distraught and upset when Raymond approached her the morning of the wedding and insisted she sign the agreement. She also testified she cried all the way to the office and on the return therefrom. Raymond testified she did not appear upset, was not crying, and, while stating she

didn't like the idea of the agreement, she did not refuse to sign it or object to signing it. Other facts were subject to the same type of diametrically opposed testimony.

Sandra claims the parties' antenuptial agreement is unenforceable because she did not understandingly enter into the agreement; and/or she entered into the agreement due to the fraud, duress, and overreaching of Raymond. Sandra cannot be heard to say she did not understand the agreement or the consequences of it. The agreement signed was the identical agreement she reviewed with her attorney in New Mexico. The terms of the agreement are clear and unambiguous. She testified she knew what she was signing. Sandra had been advised generally of the nature and extent of Raymond's assets and knew he was a multimillionaire. She had known him more than twenty years and her father had worked for Raymond during a large portion of that time. She had visited Raymond's various ranch properties and oil and gas holdings. We think it is clear that Sandra signed the agreement fully aware of its contents and the consequences of it. There is substantial competent evidence to support the trial court's findings and conclusions on these issues. When the trial court has made findings of fact and conclusions of law, the function of an appellate court is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. *Friedman v. Alliance Ins. Co.*, 240 Kan. 229, Syl. ¶ 4, 729 P.2d 1160 (1986); *Holly Energy, Inc. v. Patrick*, 239 Kan. 528, Syl. ¶ 2, 722 P.2d 1073 (1986).

Appellant's next argument under her first issue is whether she executed the antenuptial agreement voluntarily of her own free will or due to the coercive circumstances existing at the time. There have been numerous cases where a prospective wife was presented with an antenuptial agreement shortly before the wedding and, as might be expected, the courts have reached differing results based upon the factual circumstances of each case.

In *Pattison v. Pattison*, 129 Kan. 558, 283 Pac. 483 (1930), the wife brought an action to recover certain real estate devised by her husband to his children from a previous marriage. The devisees defended the action based on the terms of an antenuptial contract which was alleged to exist between the plaintiff and

her deceased husband. Plaintiff sought to have the agreement voided based on several grounds similar to those presented in the case at bar. The trial court entered judgment for the defendants based upon the pleadings and opening statements of counsel. The plaintiff appealed. On review this court observed that the deceased had presented the agreement for signature on the very day of their wedding. The court, in reversing the trial court, stated:

"The safe and certain way to have safeguarded that matter was for Pattison to have dealt fairly with his affianced bride, to have made a fair and reasonable provision for her out of his estate in consonance with his and her financial circumstances, and to have made sure that she understood what she was doing. An excellent and seemly course would have been to see to it that plaintiff had independent advice before she put her hand to that contract. It was tactless, if not manifestly unfair, to present to her for her signature on her wedding day this antenuptial contract of which she had no previous intimation and as to the effect of which she had no understanding. That, at least, is the substance of her pleading and the opening statement of her counsel. This court holds that a cause of action was stated in plaintiff's behalf." 129 Kan. at 562.

Sandra relies heavily upon the Florida case of *Lutgert v. Lutgert*, 338 So. 2d 1111 (Fla. Dist. App. 1976), to support her claim of undue influence. The facts in *Lutgert* are quite similar to those in the case at bar. In *Lutgert* the litigants and their respective spouses were acquainted socially for a considerable period of time. Following each party's divorce they began seeing one another. Their relationship grew into a love affair which was culminated by engagement in March of 1965. During the several months preceding their engagement, the subject of an antenuptial agreement had been brought up by Mr. Lutgert on more than one occasion. The bride-to-be objected to such an agreement. On April 29, 1965, the day of their wedding, the couple stopped by the jewelers to pick up their wedding rings. While at the jewelers, Mr. Lutgert took the agreement out of his pocket and for the first time presented it to his prospective wife to be signed. The bride-to-be refused. A phone call to his attorney followed, as did statements to the effect that there would be no wedding if the agreement was not executed. Ultimately, she signed the agreement. Under the terms of the agreement the wife was to receive $1,000 a month in alimony in case of divorce, although the husband's wealth was estimated at three to twenty-five million dollars. The Florida court concluded:

"The question here is not whether the wife knew what she was signing or

*what she was* or *was not getting. The agreement is* clear on its face and she can't be heard to deny its contents. The question is whether she, in the free exercise of her will, *voluntarily* signed it. Evidence that she may have gotten some legal advice has no great impact on this issue either. For one thing, the only evidence of legal advice is that within twenty four hours before the wedding, when the husband first presented the antenuptial agreement and she rebelled, she spoke on the telephone to *his* lawyers; and we have already indicated that the documentary evidence conclusively demonstrates that this conversation could not and did not result in any change in the agreement enuring to the benefit of the wife. Additionally, in the face of the grossly disproportionate benefit to the husband, whatever legal advice she may have gotten at that time certainly wouldn't tend to neutralize the other coercive factors bearing on her volition." 338 So. 2d at 1116-17.

Other cases reaching similar results, relied upon by appellant, can be readily distinguished from the case at bar based upon the facts peculiar to each case. See *Norris v. Norris*, 419 A.2d 982 (D.C. 1980); *In re Estate of Maag*, 119 Neb. 237, 228 N.W. 537 (1930); *Zimmie v. Zimmie*, 11 Ohio St. 3d 94, 464 N.E. 2d 142 (1984); *Marriage of Matson*, 41 Wash. App. 660, 705 P.2d 817 (1985).

Raymond, on the other hand, relies upon numerous cases which have upheld antenuptial agreements even when executed shortly before the wedding. In *Matlock v. Matlock*, 223 Kan. 679, the wife in a divorce case sought to avoid the consequences of an antenuptial agreement which she signed the day before the wedding. The agreement provided each party would retain his and her separate property and in the event of divorce the wife waived any claim to support, alimony, attorney fees, or any interest in the husband's property. The trial court upheld the validity of the agreement. In affirming the trial court, this court stated:

"On the appeal Norma Matlock raises the same basic issues which she raised in the trial court. She contends that the trial court erred in finding that the antenuptial agreement was fairly and understandably made and was not the result of fraud or overreaching when the evidence showed that she did not fully understand or have full knowledge of what she was signing and did not have the independent advice of counsel. The issues presented are essentially fact issues which the trial court resolved against the wife. Under established rules of law this court is required to uphold the trial court findings if they are supported by substantial competent evidence. (*Ranney v. Ranney*, 219 Kan. 428, 548 P.2d 734 [1976].) . . . We have carefully reviewed the record and find substantial competent evidence to support the findings of the trial court that the antenuptial agreement was fairly and understandably made and was not the result of fraud or overreaching."

Other cases supporting Raymond's arguments include *In re Estate of Cantrell*, 154 Kan. 546, 119 P.2d 483 (1941), and *Hafer v. Hafer*, 33 Kan. 449, 6 Pac. 537 (1885), where in each case the antenuptial agreement was signed the day of the wedding. The most that can be drawn from a review of these and other authorities is that each case must be decided upon its own facts by application of the general legal principles set forth earlier in the opinion.

The trial court's determinations that the agreement was fairly and understandingly made and was not obtained through fraud or overreaching on Raymond's part are supported by the evidence and therefore cannot be set aside by this court.

The next issue raised by Sandra is her claim that the antenuptial agreement in question is void as against public policy because it tends to promote or facilitate separation or divorce. Traditionally there was a distinction between antenuptial agreements which were entered into in contemplation of death, and fixed the parties' rights upon that contingency, and antenuptial agreements which dealt with divorce. Most of the early cases arose from the death of one of the parties and not from divorce. Agreements detailing the rights of the parties in their property upon the death of either spouse were favored by the law and liberally enforced. *Hafer v. Hafer*, 33 Kan. 449. Conversely, contracts containing terms conducive to or promoting divorce were held to violate public policy. *Neddo v. Neddo*, 56 Kan. 507, 44 Pac. 1 (1896). The more modern rule is that any antenuptial agreement which is fairly and understandingly made, equitable in its provisions, and not obtained through fraud or overreaching will be upheld. *Matlock v. Matlock*, 223 Kan. at 683. The instant agreement made provisions for Sandra in the event of divorce which the trial court found to be fair under all the circumstances and which did not operate to encourage separation or divorce. We agree that the antenuptial agreement of the parties is not void as being contrary to public policy.

Next, appellant asserts the trial judge erred when he stated in his written opinion:

"Considering her situation at the time of the marriage, the agreement which she made guaranteed her lifelong security and comfort."

The statement is subject to interpretation. Considering the fact that the support payments provided in the agreement will cease

during Sandra's lifetime if Raymond predeceases her, the statement could be considered misleading and conceivably erroneous. However, Sandra also retained all property she brought into the marriage, together with the income or increments therefrom, and the trial court may have been referring to that provision of the agreement. We do not conclude that the statement of the trial court is such that the agreement must be invalidated. The terms affecting termination of alimony were identical to those suggested by Sandra's New Mexico attorney and were not unusual in their provision that alimony or maintenance would cease upon the death of either party. The statement that the agreement provided Sandra security for life has no bearing upon the factual determinations that she freely and knowingly entered into the agreement free of any fraud or overreaching by Raymond. Having done so, she can not avoid its terms based upon her interpretation of one isolated statement by the court in its opinion.

Finally, appellant asserts error based upon the trial court's limitation of discovery pertaining to the financial condition of appellee. As indicated earlier, Sandra had a comprehensive general knowledge of Raymond's assets. She was familiar with his farm, ranch, and oil and gas holdings, much of which had been in the Adams family for over 100 years and which he wanted to preserve for his children. Raymond had furnished Sandra's attorney with a statement of assets reflecting his vast holdings in Shawnee, Wabaunsee, Meade, and Seward Counties in Kansas, and in Beaver County, Oklahoma. He had disclosed a cattle inventory of approximately $1,500,000.00 and potential income tax refunds of $150,000.00. The control of discovery is entrusted to the sound discretion of the trial court and orders concerning discovery will not be disturbed on appeal in the absence of a clear abuse of discretion. *Lone Star Industries, Inc. v. Secretary, Kansas Dept. of Transp.*, 234 Kan. 121, 131-32, 671 P.2d 511 (1983). Considering the large amount of information which was disclosed and available to Sandra, the limited restriction placed upon discovery by the trial court cannot be said to amount to an abuse of discretion.

In view of the decision reached, it is not necessary to consider the cross-appeal of the appellee.

The judgment is affirmed.

HERD, J., dissenting: I would hold the antenuptial agreement

between Raymond Adams and Sandra Adams voidable as having been obtained by duress and coercion. Duress is the wrongful act of one person which compels the assent of another to a transaction without his or her volition and thus prevents the formation of a binding contract. That occurred in this case. Sandra submitted a proposed antenuptial contract to her attorney for independent advice. Her lawyer advised Sandra not to sign the contract. Sandra told Raymond that contract was not satisfactory. Nothing more was said about an antenuptial contract until an hour before the wedding in Maple Hill. Sandra had come from New Mexico. She was dressing for the wedding. The wedding plans were all set. Under these circumstances, Raymond came to his mother's house where Sandra was staying. There, Raymond advised Sandra they were going to his office to sign the antenuptial agreement, which Sandra had previously rejected; otherwise there would be no wedding. To avoid embarrassment, humiliation, and a quarrel Sandra signed the agreement. Raymond's threat of "no wedding" coupled with all the surrounding circumstances overcame the will of Sandra. There was no meeting of the minds. I would set the contract aside.