NATIONWIDE MUTUAL INSURANCE COMPANY AND TUX BOWERS MOTOR COMPANY, INC. v. FIREMAN'S FUND INSURANCE COMPANY; TERRY EUGENE CARSON; DOWNIE WOODROW CARSON; CHARLES P. MICHAELS, ADMINISTRATOR OF THE ESTATE OF GERALD D. MICHAELS; BIS RAY LEWIS; BARBARA ANN LEWIS; HOMER EPLEY; LENDY JAMES EPLEY; OLIVER DODSON McKINNEY; CLARA McKINNEY; ST. PAUL FIRE & MARINE INSURANCE COMPANY; MARYLAND CASUALTY COMPANY; AND NATIONAL GRANGE MUTUAL INSURANCE COMPANY

No. 44

(Filed 30 July 1971)

1. Insurance § 87 —automobile liability insurance — ownership of car — title in father's name — operation by son

A father is the owner of an automobile operated exclusively by his minor son where the father registers the title in his own name and also executes the note and conditional sales contract for the balance of the purchase price. G.S. 20-279.21(9). Dicta in *Underwood v. Liability Co.*, 258 N.C. 211, are expressly disapproved.

2. Insurance § 80— automobile insurance — purpose of safety responsibility law

The purpose of the Motor Vehicle Safety-Responsibility Act is to provide protection to the public from damages resulting from the negligent operation of automobiles by irresponsible persons.

3. Appeal and Error § 67— decision of Supreme Court — interpretation

A decision of the Supreme Court must be interpreted within the framework of the facts of that particular case.

4. Insurance § 84— automobile insurance — temporary substitute vehicle

A "temporary substitute automobile" is an automobile which is not owned by the insured or his spouse and which is being temporarily used for an insured automobile that has been withdrawn from normal use because of its breakdown, repair, servicing, loss, or destruction.

Insurance Co. v. Insurance Co.

**5. Insurance § 84— automobile insurance — substitution provision — construction in favor of insured**

A substitution provision in a policy of automobile liability insurance is for the insured's benefit and is to be construed liberally in favor of the insured if any construction is necessary.

**6. Insurance § 84— substitution provision—immediate repair — peeling of paint**

An automobile was in need of immediate repair, within the meaning of a substitution provision, when the outside paint on the body of the car had begun to "spiderweb" and peel off, leaving the metal exposed.

**7. Insurance § 84— vehicle covered under automobile insurance policy — temporary replacement vehicle — consent of insured**

A temporary replacement automobile was being used, at the time of an accident, with the consent of the driver's father, who was the insured under an assigned risk policy containing a substitution provision, where there was evidence that the son kept the automobile at his father's home under circumstances implying the father's consent to use it; consequently, the temporary vehicle, which had replaced an automobile insured under the father's policy, was itself insured under the policy. G.S. 20-279.21(b)(2).

**8. Insurance § 84— purpose of substitution provision**

The object of a substitution clause is to afford temporary insurance which will protect the insured's operation of a borrowed vehicle while the automobile specified in the policy is being repaired and until it can be restored to normal use.

APPEAL by plaintiffs under G.S. 7A-30(2) from the decision of the Court of Appeals (reported in 9 N.C. App. 193, 175 S.E. 2d 741), which affirmed the judgment of *Ervin, J.,* entered at the November 1969 Session of BURKE. The case was docketed and argued in the Supreme Court as No. 44 at the Fall Term 1970.

Action for a declaratory judgment.

Plaintiffs are Nationwide Mutual Insurance Company (Nationwide) and its insured, Tux Bowers Motor Company (Tux). They seek to determine whether the policy of garage liability insurance Nationwide issued to Tux, or the owner's automobile liability policy Fireman's Fund Insurance Company (Fireman's) issued to Downie Woodrow Carson (Carson), covered the 1961 Oldsmobile which was involved in an accident on 25 October 1966 while being driven by Carson's son, Terry Eugene Carson (Terry). If Fireman's policy afforded such coverage Nationwide's policy excluded coverage.

In addition to Fireman's, Carson, and Terry, all persons having potential claims against Terry for damages arising out of the accident and all insurance companies having potential liability coverage to passengers in the 1961 Oldsmobile under policies containing uninsured motorist insurance were made parties-defendant.

The evidence of the parties, which was without material conflict except in the one instance hereinafter specifically noted, tended to show:

In 1966 Terry, a minor born 22 September 1949, resided in the home of his father as a member of his family. On 1 April 1966, following negotiations between Terry and the president of Tux, Mr. Tux Bowers (Bowers), Terry agreed to buy from Tux a 1965 Oldsmobile carrying a ten-months warranty. Terry made the $600.00 down payment from funds he had saved for that purpose. Because of Terry's minority, title to the vehicle was taken in the name of his father, who signed the note for the balance of the purchase price and the conditional sales contract securing it. Terry, however, bought the license, made the monthly payments on the car, and paid all the expenses of its operation and maintenance. His mother could not drive, and Carson did not drive the vehicle.

Following the purchase of the 1965 Oldsmobile, Carson secured an all purpose endorsement which added the 1965 Oldsmobile to the policy of liability insurance which Fireman's had previously issued to him under the assigned risk plan. Terry paid the $72.00 premium for this endorsement in which he was "added as driver" of the 1965 Oldsmobile. Carson's policy with Fireman's was in full force and effect on 25 October 1966.

Terry drove the 1965 Oldsmobile at his pleasure and as his own. Carson did not restrict his use of it in anyway, and Terry never asked his permission to use the car. About five months after its purchase, the paint on the 1965 Oldsmobile cracked and peeled. Without consulting Carson, Terry reported this development to Bowers. The warranty still being in effect, on 4 October 1966 Bowers agreed to have the car repainted. He and Terry arranged with Williams Paint and Body Shop to do the job, which was supposed to take four or five days. Terry, who lived fourteen miles from his employment in Morganton, requested Bowers to provide him transportation while the

1965 Oldsmobile was being repainted. Bowers agreed to lend Terry a 1961 Oldsmobile from Tux's used car lot. Tux owned this vehicle, which carried one of its dealer's license plates.

Bowers testified that he let Terry have the 1961 Oldsmobile for the purpose of driving to and from work and stipulated that he park it each morning on Tux's used car lot so that it would be available for sale; that he not drive the car at night; and that he "not run all over the country with the car." In contradiction of Bowers, Terry testified that Bowers provided the 1961 Oldsmobile in lieu of the 1965 model; that the only restriction he placed upon its use was the requirement that it be parked on Tux's lot during the day so that it would be available for sale; and that he drove the car both day and night, just as he had driven the 1965 Oldsmobile. Both Terry and Bowers testified that on each working day while Terry was using the car he returned it to Tux's lot about 8:00 a.m. and got it again between 5:00 and 5:30 p.m., and that on the weekends he kept the car with him.

Carson was not a party to Terry's arrangement with Bowers, and he knew nothing about the conditions under which Bowers let Terry have the 1961 Oldsmobile. While Terry had the car he parked it in his father's yard just as he had parked the 1965 Oldsmobile, and Carson never made any objection to his use of the car. Carson testified: Terry "used it to drive it where he wanted to and in the same manner that he had driven the 1965 Oldsmobile before it was put in the shop to be painted."

Three weeks after he got the 1961 Oldsmobile, on the night of 25 October 1966 in the town of Old Fort, Terry wrecked the vehicle in a one-car accident. With him at the time were Clara McKinney, Lendy Epley, Barbara Ann Lewis, and Gerald D. Michaels, "a carload of teenagers." Michaels died as a result of the injuries he received in the wreck. On 25 October 1966 the 1965 Oldsmobile was still at the Williams Paint and Body Shop, which had not begun repainting it. The job was not done until about two weeks later.

Admissions in the pleadings establish: (1) The administrator of the estate of Gerald D. Michaels has sued Carson, Terry, and Tux to recover damages for his wrongful death. (2) Barbara Ann Lewis, by her next friend, has brought suit against

the same three defendants to recover damages for personal injuries which she sustained in the wreck. (3) The father of Barbara Ann Lewis, Bis Ray Lewis, has likewise sued to recover the damages he sustained in consequence of her injuries. (4) Lendy James Epley, Clara McKinney, and the father of each also have potential claims for damages arising out of the accident. (5) A dispute exists between Nationwide and Fireman's as to whether Fireman's policy covered Terry's operation of the 1961 Oldsmobile on 25 October 1966.

The garage liability policy which Nationwide issued to Tux, *inter alia,* covered any automobile owned, maintained, or used by Tux "for the purpose of garage operations." It insured any person using such an automobile with Tux's permission, provided (1) such person's actual operation of the vehicle is "within the scope of such permission," and (2) "if no other valid and collectible automobile liability insurance, either primary or excess, with limits of liability at least equal to the minimum limits specified by the Financial Responsibility Law of the state in which the automobile is principally garaged, is available to such person; . . . . "

The policy which Fireman's issued to Carson covered any automobile described therein and insured any person using the automobile, "provided the actual use of the automobile is with the permission of the named insured." The policy also covers "an automobile not owned by the named insured . . . while temporarily used as a substitute for the described automobile when withdrawn from normal use because of its breakdown, repair, servicing, loss, or destruction; . . . . "

Nationwide contends: (1) At the time of the accident, on 25 October 1966, Terry was not driving the 1961 Oldsmobile "within the scope of his permission" from Bowers, and coverage under the garage liability policy is therefore excluded; (2) the policy which Fireman's issued to Carson provided "other valid and collectible automobile liability insurance" to Terry, and this coverage also excluded coverage by Nationwide.

Fireman's denied coverage on the following grounds: (1) The 1965 Oldsmobile, although named in Carson's policy, was not covered by it because Terry, not Carson, owned the vehicle; (2) even if Carson was the owner of the 1965 Oldsmobile, the 1961 Oldsmobile was not a "temporary substitute automobile"

for it within the meaning of the policy; and (3) even if the 1961 Oldsmobile was a temporary substitute automobile it was not being used with Carson's consent.

At the conclusion of all the evidence Judge Ervin held as a matter of law that (1) on 25 October 1966 Terry alone owned the 1965 Oldsmobile, and Carson had no right to control it; (2) on 25 October 1966 the vehicle had not been withdrawn from normal use due to its breakdown, repair, servicing or destruction, and Terry was not operating Tux's 1961 Oldsmobile as a temporary substitute for the 1965 Oldsmobile; (3) at the time of the accident in suit Terry was not operating the 1961 Oldsmobile with the permission, express or implied, of Carson or his spouse, neither of whom had the right of possession or the right to control it; and (4) Terry was not a named insured in the policy of liability insurance issued by Fireman's, and his operation of the 1961 Oldsmobile was not covered by the policy which Fireman's had issued to Carson. Judge Ervin submitted to the jury the following issue, which was answered No: "Was Terry Eugene Carson operating the 1961 Oldsmobile owned by Tux Bowers Motor Company, Inc., on the occasion of the accident on October 25, 1966, beyond the scope of the permission given by Tux Bowers Motor Company, Inc.?"

Upon his conclusions of law and the jury's verdict, Judge Ervin entered judgment decreeing that (1) Nationwide was obligated, under its garage liability policy issued to Tux, to defend Terry in any action instituted against him on account of his operation of the 1961 Oldsmobile on 25 October 1966 and to pay any judgments which might be entered against Terry and Tux within the policy's limitations of liability; (2) Fireman's policy did not cover Terry's use and operation of the 1961 Oldsmobile, and Fireman's has no obligation either to Carson or Terry on account of the accident on 25 October 1966; and (3) the other insurance companies made parties-defendant to the action had no liability for injuries resulting from the wreck of the 1961 Oldsmobile.

Plaintiffs appealed to the Court of Appeals, which affirmed the judgment in a two-to-one decision. Because of the dissent, plaintiffs appealed as a matter of right to the Supreme Court.

*Thomas M. Starnes for plaintiff appellants.*

*Byrd, Byrd & Ervin for Charles P. Michaels, Administrator of the Estate of Gerald D. Michaels, defendant appellee.*

*Mitchell & Teele for St. Paul Fire and Marine Insurance Company, defendant appellee.*

*Roy Walton Davis for Barbara Lewis and Bis Ray Lewis, defendant appellees.*

*Uzzell and Dumont for Fireman's Fund Insurance Company, defendant appellee.*

SHARP, Justice.

The verdict of the jury, which established that at the time of the accident on 25 October 1966 Terry was operating the 1961 Oldsmobile within the scope of his permission from Tux, is not challenged by any assignment of error. Therefore, plaintiffs' policy covered Terry's operation of that vehicle *unless* the assigned risk policy which Fireman's issued to Carson insuring the 1965 Oldsmobile covered Terry's operation of the 1961 Oldsmobile is as a substitute vehicle for the 1965 Oldsmobile. If it did, Nationwide's coverage is excluded; otherwise, not. Fireman's concedes that the issue submitted "was the only one raised and presented under the pleadings and evidence, and about which there was contraverting or conflicting testimony."

[1] The first question presented is: Who, within the purview of the Motor Vehicle's Safety-Responsibility Act of 1953 (N. C. Gen. Stats., ch. 20, art. 9A), was the *owner* of the 1965 Oldsmobile on 25 October 1966? As used in an owner's or operator's policy of liability insurance, the Safety-Responsibility Act (Act), G.S. 20-279.1(9) defines the word *owner* as "a person who holds the legal title of a motor vehicle, or in the event a motor vehicle is the subject of an agreement for the conditional sale or lease thereof with the right of purchase upon performance of the conditions stated in the agreement and with an immediate right of possession vested in the conditional vendee or lessee, or in the event a mortgagor of a vehicle is entitled to possession, then such conditional vendee or lessee or mortgagor shall be deemed the owner for the purposes of this article."

Under this definition, the word *owner* embraces "the holder of title and a mortgagor, conditional vendee or lessee having

right of purchase and the right of possession." *Insurance Co. v. Hayes,* 276 N.C. 620, 630, 174 S.E. 2d 511, 517. Indubitably Carson held the legal title to the 1965 Oldsmobile, and, having given his note for the balance of the purchase price and executed a conditional sales contract securing it, he was also a conditional vendee with the right of possession. Thus he was covered by every aspect of the statutory definition of owner. Furthermore, as noted in *Insurance Co. v. Hayes, supra,* in enacting the 1963 amendment to G.S. 20-72(b) (which provides that title to a motor vehicle cannot be transferred from one owner to another until the certificate of title has been duly executed and the vehicle delivered to the transferee), the legislature "used the word 'title' as a synonym for the word 'ownership'." The opinion also pointed out that "G.S. 20-38 defines 'owner' under the Motor Vehicles Act and G.S. 20-279.1 defines 'owner' essentially the same way." *Id.* at 630, 174 S.E. 2d at 517.

[2] Legal title to the 1965 Oldsmobile being in Carson, it is immaterial to decision here that Terry may have had an equitable interest in the vehicle to the extent of the payments he had made on the purchase price. The purpose of the Act is to provide protection to the public from damages resulting from the negligent operation of automobiles by irresponsible persons. By its definition of an "owner," the legislature attempted to close all avenues of escape from its provisions. *Insurance Co. v. Hayes, supra; Harrelson v. Insurance Co.,* 272 N.C. 603, 158 S.E. 2d 812; *Indiana Lumberman's Mutual Insurance Co. v. Parton,* 147 F. Supp. 887 (M.D.N.C. 1957).

We have no statistics showing how many parents have insured an automobile to which they hold legal title for the benefit of a minor child under circumstances similar to those of this case. It is not, however, an unusual situation. *See Smith v. Simpson,* 260 N.C. 601, 133 S.E. 2d 474. When a minor's negligent operation of such a vehicle causes injury and death, were the insurer permitted to escape liability by showing that the minor was the equitable owner of the vehicle it had insured, the purpose of the Act would be thwarted and the public subjected to the risk of injury from unnumbered, uninsured minor drivers. The legislature has perpetuated no such hoax. Available statistics show that in 37% of all automobile accidents in which licensed drivers were involved in North Carolina during

the year 1970, the drivers were under the age of twenty-five years, and that half of these were in the 16-19 age group.

We hold that Carson, who had the legal title, was the owner of the 1965 Oldsmobile; that he had authority to control it; and that it was covered by his Fireman's policy, which listed it as an insured automobile and Terry "as driver." It is obvious that, in deciding otherwise, both the trial court and the Court of Appeals were misled by dicta in *Underwood v. Liability Co.,* 258 N.C. 211, 128 S.E. 2d 577.

The facts in *Underwood,* which are clearly distinguishable from those of this case, were these: Mrs. *C* purchased an automobile for her son, *J,* aged 17, and took title in her name. In her application for insurance she stated that she was the owner of the car but it would be operated by *J* "100% of the time." The risk was assigned to the defendant insurance company, which issued a policy meeting the requirement of G.S. 20-279.21. In June 1958, two months later, Mrs. *C* moved to Florida after arranging for *J* to remain in North Carolina with plaintiff. On 9 June 1958 Mrs. *C* transferred title to the automobile to the plaintiff. On 27 June 1958 Mrs. *C* canceled the liability policy which had been issued to her, and application was made for a new policy to be issued to the plaintiff. The producer of record held this application pending payment of the premium, which was to accompany it. Because of a month's delay in refunding Mrs. *C*'s unearned premium and an error in the amount of the refund, the premium for the plaintiff's policy was never paid. On 4 August 1958 the plaintiff's son was riding with *J* when the car overturned and both were killed. Plaintiff, as administrator of her son's estate, brought suit for his wrongful death against the administrator of *J*. She recovered judgment and sued the defendant insurance company when it declined to pay. In that suit, upon a waiver of jury trial, the judge found facts as detailed above. He also found that *J* was the beneficial owner of the automobile and that the producer of record had no authority from *J* or the plaintiff to surrender the policy to the defendant for cancellation. This Court reversed judgment for the plaintiff upon the ground that when Mrs. *C* transferred title to the automobile to the plaintiff, the defendant's insurance was terminated as a matter of law. The rationale was that an owner's motor vehicle liability policy is a contract between the insurance company and the owner, and there is no insurance

separate and distinct from the ownership of the car. The opinion pointed out that the Safety Responsibility Act makes no requirement that insurance follow the vehicle in case of transfer of title and that the policy expressly declared that "assignment of entry shall not bind the company (insurer) until its consent is endorsed hereon."

Following the statement of the court's decision, the opinion then said:

"It is not clear what significance the trial court placed upon its finding that Jerry Wayne Otwell (J) was the beneficial owner of the automobile. If the import is that he was the owner and had right of possession and control, there was most certainly no coverage. The insurance contract was with Mrs. Chaffin (Mrs. C) and the policy covered the named insured, Mrs. Chaffin (plaintiff), and any other person while using the automobile, provided the actual use was with the *permission* of Mrs. Chaffin. In order to grant permission, as the word 'permission' is used in the policy, there must be such ownership or control of the automobile as to confer the *legal* right to give or withhold assent. It is something apart from a general state of mind. If Jerry actually owned the automobile and had the right to possession and control, or if Mrs. Chaffin parted with the title (and it is undisputed that she assigned to Mrs. Underwood on 9 June 1958 such title as she had) then, in either event, the operation of the car by Jerry on 4 August 1958 was not with permission of Mrs. Chaffin within the purview of the omnibus clause of the policy. Insurer had no contract with or responsibility to or for Jerry apart from the ownership of the vehicle by Mrs. Chaffin." *Id.* at 219, 128 S.E. 2d at 582-583.

[3]   The foregoing statement was obviously unnecessary to the decision of the case, and all suggestions therein that Jerry Wayne Otwell may have been the owner of the automobile are disapproved. "A decision of the Supreme Court must be interpreted within the framework of the facts of that particular case." *Howard v. Boyce,* 254 N.C. 255, 265, 118 S.E. 2d 897, 905. *Accord, Insurance Co. v. Insurance Co.,* 276 N.C. 243, 172 S.E. 2d 55. In *Underwood,* at the time of the damage in suit, the holder of the legal title to the automobile involved had no liability insurance on the vehicle, and the former owner had canceled the insurance she carried on the car prior to the time

she transferred title to it. The automobile which *J* was driving was indeed an uninsured vehicle. In this case, the 1965 Oldsmobile was an insured automobile described in a policy of insurance issued to the owner, the holder of the legal title.

It is too clear for argument that at all times Terry used the 1965 Oldsmobile with his father's unqualified permission. Carson took title to the vehicle in his name, assumed responsibility for the balance of the purchase price, and procured liability insurance upon it for the sole purpose of providing his minor son with an automobile. During the six months intervening between the purchase of the 1965 Oldsmobile and the day it was delivered to Williams Paint and Body Shop to be repainted, Carson himself never drove it over twice, if he drove it at all. Had Terry been driving the 1965 Oldsmobile on the evening of 25 October 1966 he would undoubtedly have been covered by the policy which Fireman's had issued to Carson. We hold that Carson was the owner of the 1965 Oldsmobile and that it was covered by the policy which Fireman's had issued to him.

[4] The next question is whether Fireman's policy covered the 1961 Oldsmobile as a "temporary substitute automobile" for the 1965 Oldsmobile. Such an automobile is (1) one not owned by the insured or his spouse and (2) one which is being temporarily used for an insured automobile while it is "withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction." It is undisputed that neither Carson nor his wife owned the 1961 Oldsmobile which Terry was driving at the time of the accident. Tux admits its ownership of that vehicle.

[5, 6] It is equally clear that while the 1965 Oldsmobile remained in the Williams Paint and Body Shop for the removal and replacement of outside paint which had proved defective, the insured vehicle had been withdrawn from normal use "because of its . . . repair. . . . " A substitution provision in a policy of automobile liability insurance "is for the insured's benefit and is to be construed liberally in favor of the insured if any construction is necessary." 7 Am. Jur. 2d *Automobile Insurance* § 103 (1963). *See Hunnicutt v. Insurance Co.,* 255 N.C. 515, 122 S.E. 2d 74; 4 N. C. Index 2d *Insurance* § 84 (1968). As the court said in *Sanz v. Reserve Insurance Co. of Chicago,* 172 So. 2d 912, 913 (Fla. App. 1965), the terms of a substitution

provision in an automobile policy "should be defined and given their every day 'man-on-the-street' understood meaning." When the outside paint on the body of an automobile "spiderwebs" and peels off, leaving the metal exposed, the vehicle is in need of immediate repairs.

Nothing this Court said in *Ransom v. Casualty Co.*, 250 N.C. 60, 108 S.E. 2d 22, impinges upon the foregoing statement. In *Ransom,* it was held that an insured automobile, which was not used because it was "low on gas," was not "withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction," and the substitute automobile which insured borrowed for the evening was, therefore, not covered by his policy. The Court rejected the plaintiff's contention that the insured vehicle had been temporarily withdrawn for "servicing." Fireman's contention that *Ransom v. Casualty Co., supra,* is authority for the proposition that, before an insured automobile can be replaced by a temporary substitute vehicle, it must be withdrawn from use because of some *mechanical* defect cannot be sustained. We hold that on 25 October 1966 the 1965 Oldsmobile had been temporarily withdrawn from normal use for repairs and that the 1961 Oldsmobile was a temporary substitute for it.

[7] The remaining question is whether the 1961 Oldsmobile was being used with Carson's consent on the evening of 25 October 1966. If so, it became an insured automobile, temporarily replacing the 1965 Oldsmobile in Carson's policy just as it had replaced its actual use.

Fireman's first contends that permission to use one automobile does not constitute permission to obtain and use a substitute vehicle; that only Carson, the named insured, could authorize the procurement of a substitute automobile and grant permission for its use, and he did neither. This contention ignores the fact that, notwithstanding Terry procured the 1961 Oldsmobile from Tux "on his own" and without his father's knowledge, Terry forthwith took the car to his father's home and kept it there under circumstances which clearly implied his consent for Terry to use the vehicle. Carson testified that Terry "used it and drove it where he wanted to and in the same manner he had driven the 1965 Oldsmobile before it was put in the shop to be repainted." Carson's purpose in taking title to the 1965 Oldsmobile was to provide general transportation for his son. When Bowers delivered the 1961 Oldsmobile to Terry as

a temporary substitute for the 1965 Oldsmobile he was merely furthering Carson's previously permitted purpose. *See Hemphill v. Home Insurance Company,* 121 Ga. App. 323, 174 S.E. 2d 251.

Section III(a), the omnibus provision of Fireman's policy, provided in pertinent part that "the unqualified word 'insured' includes the named insured and . . . any person while using the automobile . . . . provided the actual use of the automobile is by the insured or spouse or with the permission of either. . . ." Under G.S. 20-279.21(b)(2), such permission may be either express or implied. "[T]his implication may be a product of the present or past conduct of insured. Implied permission is not confined alone to affirmative action, and is usually shown by usage and practice of the parties over a sufficient period of time prior to the day on which the insured car was being used. It may be established by a showing of a course of conduct or relationship between the parties, including lack of objection to the use by the permittee which signifies acquiescence or consent of the insured." 7 Am. Jur. 2d *Automobile Insurance* § 113 (1963). *Accord, Insurance Co. v. Insurance Co., supra;* 4 N. C. Index 2d *Insurance* § 87 (1968).

Fireman's second contention is that because Carson did not own the 1961 Oldsmobile, he could not authorize its use by another. Since a "temporary substitute automobile" within the meaning of a liability policy is a vehicle *not owned* by the insured, to adopt Fireman's contention would be to hold that such an automobile could be covered only while being operated by the named insured himself. Such a construction would defeat the purpose of the omnibus clause, and the policy will not permit it. Under Part I, Coverage A and B, and Part IV(3), a temporary substitute automobile being operated by the insured or any person with his express or implied consent is an insured automobile. *See Hardware Mutual Casualty Co. v. Hopkins,* 106 N.H. 412, 213 A. 2d 692, and *Davidson v. Fireman's Fund Indemnity Co.,* 165 N.Y.S. 2d 598.

[8] The object of the substitution clause is to afford temporary insurance which will protect the insured's operation of a borrowed vehicle while the automobile specified in the policy is being repaired and until it can be restored to normal use. "The provision is not to be unreasonably extended to materially increase the risk contemplated by the insurer. Neither is it to be narrowly applied against the insured, for the clause was

designed for his protection." *Harte v. Peerless Insurance Co.,* 123 Vt. 120, 124, 183 A. 2d 223, 226.

In *Hemphill v. Home Insurance Co., supra* at 333, 174 S.E. 2d at 259, it is said: "The purpose (of a substitution clause) is not to defeat liability but reasonably to define coverage by limiting the risk to one operating vehicle at a time for a single premium."

We have found no decision involving facts "on all fours" with those of this case, and the parties have cited none. The decisions in *Tanner v. Insurance Co.,* 226 F. 2d 498 (6th Cir. 1955) and *Grundeen v. Fidelity & Guaranty Co.,* 238 F. 2d 750 (8th Cir. 1956), cited by Fireman's, involve facts so different from those *sub judice* that they require no discussion.

[7] We hold that on 25 October 1966 Terry was operating the 1961 Oldsmobile with Carson's consent; that it was an automobile covered by Fireman's policy; and that Terry was an insured driver.

The decision of the Court of Appeals affirming the judgment of the Superior Court that Nationwide is obligated to defend the actions instituted against Terry and to pay any judgments which might be entered against him to the extent of its policy limits and that Fireman's has no obligation to Terry with respect to these actions is reversed. The cause is returned to the Court of Appeals for remand to the Superior Court for entry of judgment that Fireman's is obligated to defend the actions instituted against Terry on account of his operation of the 1961 Oldsmobile on the evening of 25 October 1966 and to pay any judgments which may be entered against him to the extent of the policy limits and that Nationwide has no obligation with reference to those actions.

Reversed and remanded.