DOUGLAS J. MARTINI, Plaintiff v. COMPANION PROPERTY & CASUALTY
INSURANCE COMPANY, Defendant

No. COA08-1127

(Filed 7 July 2009)

### 1. Insurance— automobile—UIM—substitute vehicle

The trial court did not err by granting summary judgment for plaintiff on the question of whether a UIM policy provided coverage where the only vehicle on the policy was a Toyota Sequoia, the policy allows a temporary substitute if the covered auto is out of service, plaintiff had to drive to the airport but was concerned about a dashboard brake light on the Sequoia which had come on again after a recent service, plaintiff asked his wife to take the Sequoia for service and drove another car to the airport, he suffered a serious accident, and his wife drove the Sequoia to the hospital. Had plaintiff not been injured while driving to the airport, it is reasonable to assume that plaintiff's wife would have taken the car to the mechanic and it would have been completely unusable.

### 2. Insurance— automobile—UIM—professional association as insured—use of personal car

Plaintiff was an insured under a UIM policy even though the policy listed his professional association as the insured and plaintiff was driving a personal car. The policy clearly states that anyone occupying a temporary substitute for a covered auto is insured.

### 3. Insurance— automobile—UIM—stacking of policies— credit for payment

The trial court properly granted summary judgment for plaintiff in an action to determine underinsured motorist coverage where defendant argued that it was entitled to a credit for the $250,000 payment made by plaintiff's primary insurance carriers. N.C.G.S. § 20-279.21(b)(4) permits interpolicy stacking of coverage limits. Plaintiff had received $30,000 from the exhausted liability policy, which was credited against his underinsured coverage under his primary policy, both of those policies were exhausted, and plaintiff still had $1,000,000 underinsured motorist coverage under his policy with defendant.

### 4. Insurance— unfair claims practice—investigation and denial of claim—issues of fact

The trial court erred by granting summary judgment for defendant insurer on an unfair claims practices and unfair trade practices claim in an action to determine UIM coverage. There were issues of material fact concerning defendant's investigation and denial of the claim.

Judge STEELMAN dissenting in part and concurring in the result in part.

Appeal by plaintiff and defendant from order entered 12 May 2008 by Judge Leon J. Stanback, Jr., in Wake County Superior Court. Heard in the Court of Appeals 25 February 2009.

*Brown, Crump, Vanore & Tierney, L.L.P., by R. Scott Brown and W. John Cathcart, Jr., for plaintiff.*

*Teague, Campbell, Dennis & Gorham, L.L.P., by Henry W. Gorham and Edward S. Schenk III, for defendant.*

ELMORE, Judge.

Both Douglas J. Martini, M.D. (plaintiff), and Companion Property & Casualty Insurance Company (defendant) appeal from a 12 May 2008 order granting partial summary judgment to both parties. For the reasons stated below, we affirm that part of the order granting summary judgment to plaintiff and reverse that part of the order granting summary judgment to defendant.

**Background**

On 9 January 2005, plaintiff's wife informed plaintiff that the brake warning light of their 2001 Toyota Sequoia was on. Mrs. Martini testified that because the brakes in the Sequoia had recently been serviced due to premature wear, she planned to take the Sequoia to be repaired the next morning. Plaintiff normally drove the Sequoia, which was insured in the name of his professional association, Douglas J. Martini, M.D., P.A. However, because his wife planned to take the Sequoia to be repaired, plaintiff drove the couple's other car, a 2001 Mitsubishi Montero, to the airport early on the morning of 10 January 2005. Plaintiff was planning to attend a medical conference.

At approximately 4:54 a.m., as plaintiff was driving to the airport, the Montero was struck by a vehicle driven by Nicholas Marquez.

MARTINI v. COMPANION PROP. & CAS. INS. CO.

[198 N.C. App. 39 (2009)]

Marquez had tried to drive his car from the left lane to the center lane between two vehicles that were already driving in the center lane. Marquez failed, colliding with the back of plaintiff's Montero, which caused plaintiff to lose control of his car. The Montero flipped over on the roadway several times, then flipped over the median barrier, eventually coming to rest on the median on the other side of the highway.

Plaintiff was extracted from his car and taken to the trauma center at a local hospital. He had a fracture to his C-7 vertebra, left and right rotator cuff contusions, a puncture wound in his left chest, as well as various lacerations and abrasions on his body. He returned to work about three weeks later, for two hours at a time. However, after six weeks, the fracture had slipped out of place and there was severe nerve compression. Plaintiff underwent surgical fusion surgery on 8 March 2005 to repair his broken neck. He was not able to return to work for nearly six months following the collision.

Plaintiff's wife drove the Sequoia to and from the hospital on 10 January 2005. Plaintiff next took the Sequoia to be serviced on or about 24 March 2005.

Marquez carried minimum liability insurance coverage of $30,000.00. Plaintiff made a claim against Marquez's insurance policy as well as the underinsured and medical payments provisions of his insurance policies for the Montero and Sequoia. Marquez's insurance carrier paid plaintiff $30,000.00, the limit of Marquez's policy. Plaintiff notified his insurers, including defendant. Plaintiff's primary carrier, Southern Guarantee Insurance Company (Southern Guarantee), paid plaintiff $250,000.00, the limit of that policy's coverage. The coverage limit of plaintiff's underinsured and medical payments insurance policy (the UIM policy) with defendant was $1,000,000.00. Defendant denied plaintiff's underinsured and medical payments claims.

Plaintiff then filed a complaint, asking the court to "declare the coverage, and the rights, responsibilities, duties and obligations of the parties under the Defendant's policy of insurance and that the vehicle which Plaintiff was operating be declared a covered vehicle under Defendant's policy of insurance and that Defendant's policy be declared to cover plaintiff's injuries and damages." Plaintiff also alleged that defendant had engaged in unfair claims practices and/or unfair and deceptive trade practices, entitling him to treble damages. Defendant counterclaimed, asking for a declaratory judgment "declaring the relative rights and obligations of the parties under" the

UIM policy and declaring that the UIM policy "does not provide coverage for the uninsured/underinsured benefits" sought by plaintiff. Defendant also sought to dismiss plaintiff's complaint.

Defendant moved for summary judgment as to the insurance coverage question and plaintiff's unfair and deceptive trade practices claim. Defendant moved, in the alternative, for summary judgment that the policy's potentially applicable limit of $1,000,000.00 had been legally reduced by the $250,000.00 payments tendered by Southern Guarantee. Plaintiff also moved for summary judgment on the insurance coverage question and his unfair and deceptive trade practices claim.

On 12 May 2008, the trial court entered an order of summary judgment. The order granted plaintiff's motion in part and defendant's motion in part. The trial court concluded that the UIM policy did provide uninsured motorist coverage and medical payments coverage to plaintiff for the collision. It also concluded that the uninsured motorist insurance limit was $1,000,000.00 upon satisfactory proof of damages; no credit was due defendant for prior liability insurance payment or prior underinsured motorist payment. Finally, the trial court concluded that defendant had not committed any unfair settlement practices or unfair and deceptive trade practices; the trial court dismissed those claims with prejudice.

Both parties now appeal. We address defendant's arguments first and then reach plaintiff's.

**Defendant's Appeal**

**[1]** Defendant first argues that the trial court erred by granting summary judgment to plaintiff because the UIM policy does not provide insurance coverage to plaintiff as a matter of law. We disagree.

The only vehicle that is listed on the UIM policy's "Schedule of Autos You Own" is the Sequoia, which is owned by plaintiff's business entity, Douglas J. Martini, M.D., P.A. The UIM policy includes the following relevant language:

B. Who Is An Insured

If the Named Insured is designated in the Declarations as:

\* \* \*

2. A partnership, limited liability company, corporation or any other form of organization, then the following are "insureds":

a. Anyone "occupying" a covered "auto" or a temporary substitute for a covered "auto". The covered "auto" must be out of service because of its breakdown, repair, servicing, "loss" or destruction.

b. Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured".

Defendant argues that the Montero was not a temporary substitute for the covered auto, the Sequoia, because the Sequoia was not out of service because of its breakdown, repair, servicing, loss, or destruction. Defendant points to Mrs. Martini's use of the Sequoia to drive to the hospital on the morning of the accident as evidence that the Sequoia was not out of service. To support this position, defendant relies on the Supreme Court's opinion in *Ransom v. Fidelity and Casualty Co.*, 250 N.C. 60, 108 S.E.2d 22 (1959), and on our opinion in *Maryland Casualty Co. v. State Farm Mutual Automobile Insurance Company*, 83 N.C. App. 140, 349 S.E.2d 307 (1986).

In *Ransom*, Francis Lee drove his brother's car because his own car, a Buick, was "low on gas." *Ransom*, 250 N.C. at 60, 108 S.E.2d at 22. Lee collided with a man on a bicycle, who was killed. *Id.*, 250 N.C. at 61, 108 S.E.2d at 23. The man's estate sued Lee for wrongful death and sought payment from the Buick's insurer, arguing that the brother's car was a temporary substitute vehicle for the Buick. *Id.* at 62, 108 S.E.2d at 23. The brother's car was not insured. *Id.* at 61, 108 S.E.2d at 23. The trial court dismissed the case, and the Supreme Court affirmed because the policy required that the covered vehicle be "withdrawn from normal use" and being "low on gas" did not mean that the Buick had been withdrawn from normal use. *Id.* at 64, 108 S.E.2d at 25. The Supreme Court did note, however, that "[i]t would seem there could be circumstances under which one might be justified in substituting another car, if the one insured was so defective mechanically that the owner was afraid to drive it on an extended trip." *Id.* (citation omitted).

*Maryland Casualty* also involved a collision, this time between Kell Thomas and Max Sherrill. *Maryland Casualty*, 83 N.C. App. at 141, 349 S.E.2d at 308. Sherrill was injured in the collision and his insurer sought payment from Thomas's insurer. *Id.* However, the truck that Thomas was driving that day was not insured; Thomas's only vehicle insurance policy was on a car. *Id.* Sherrill's insurer argued that the truck was a temporary substitute vehicle for the car and, thus, was covered by the insurance policy. The policy defined a

temporary substitute vehicle as one driven because the covered vehicle was "out of normal use because of its: a. breakdown; b. repair; c. servicing; d. loss; or e. destruction." *Id.* at 142, 349 S.E.2d at 308. This Court concluded that Thomas's truck was not a temporary substitute vehicle because the car was only "rusted out" and "in bad condition," which did not remove the car from normal use. *Id.*

The case at hand is easily distinguished from both *Ransom* and *Maryland Casualty* and instead better falls in line with *Nationwide Mutual Insurance Company v. Fireman's Fund Insurance Company*, 279 N.C. 240, 182 S.E.2d 571 (1971). In *Fireman's Fund*, our Supreme Court affirmed coverage when the covered vehicle was at a paint and body shop to be repainted and the insured wrecked the car he had borrowed while his was being repainted. *Id.* at 250-51, 182 S.E.2d at 578. Here, plaintiff and his wife were concerned with the safe operation of the Sequoia. The car's brakes had been recently repaired, and the brake light on the dash indicated that something was amiss again with the brakes. Without question, the car was operational, but plaintiff asked his wife to have it serviced because the brake light was on. Had plaintiff not been injured while driving to the airport, it is reasonable to assume that Mrs. Martini would have taken the car to the mechanic on the morning of 10 January 2005, and the car would have been completely unusable, as in *Fireman's Fund*. It is also reasonable to assume that Mrs. Martini did not immediately have the Sequoia serviced because her husband had broken his neck in a car accident that morning. When plaintiff drove the Montero to the airport, it was because the Sequoia was out of service; he had asked his wife, an officer of his professional association, to take the car to be repaired.

**[2]** Defendant next argues that plaintiff was not an "insured" under the UIM policy because he is an individual and the policy lists plaintiff's professional association as the insured. Again, we disagree. The policy clearly states that anyone occupying a temporary substitute for a covered auto, the Montero in this case, is insured. Plaintiff was occupying the Montero and is therefore covered by the policy.

**[3]** Defendant next argues that, even if plaintiff is covered by the UIM policy, defendant is entitled to a credit for the $250,000.00 payment made by plaintiff's primary insurance carriers, thereby reducing the maximum available coverage to $750,000.00. Again, we disagree.

The Motor Vehicle Safety and Financial Responsibility Act (the Act) exists to protect "innocent victims who may be injured by finan-

cially irresponsible motorists." *Hendrickson v. Lee,* 119 N.C. App. 444, 449, 459 S.E.2d 275, 278 (1995) (quotations and citation omitted). "[T]he provisions of the Act 'are written into every automobile liability policy as a matter of law, and, when the terms of [a] policy conflict with the statute, the provisions of the statute will prevail.' " *Id.* (quoting *Insurance Co. v. Chantos,* 293 N.C. 431, 441, 238 S.E.2d 597, 604 (1977)) (internal quotations omitted; alteration in original). The Act includes N.C. Gen. Stat. § 20-279.21(b)(4), which states that a liability insurance policy "shall . . . provide underinsured motorist coverage." N.C. Gen. Stat. § 20-279.21(b)(4) (2007).

> [I]f a claimant is an insured under the underinsured motorist coverage on separate or additional policies, the limit of underinsured motorist coverage applicable to the claimant is the difference between the amount paid to the claimant under the exhausted liability policy or policies and the *total limits of the claimant's underinsured motorist coverages as determined by combining the highest limit available under each policy*[.]

*Id.* (emphasis added). As this Court recently noted, § 20-279.21(b)(4) permits interpolicy "stacking" of coverage limits. *Benton v. Hanford,* 195 N.C. App. 88, 93, 671 S.E.2d 31, 34 (2009). In this case, the highest limits available under each of plaintiff's underinsured motorist coverages were $250,000.00 (Southern Guarantee) and $1,000,000.00 (defendant). Plaintiff had received $30,000.00 from Marquez's exhausted liability policy, which was credited against plaintiff's underinsured motorist coverage under his Southern Guarantee policy, the primary policy. In other words, Marquez's policy paid $30,000.00 and Southern Guarantee paid $220,000.00, exhausting both of those policies. Plaintiff still had $1,000,000.00 underinsured motorist coverage remaining under his UIM policy with defendant. Accordingly, the trial court properly granted summary judgment to plaintiff as to his underinsured motorist coverage limit.

## Plaintiff's Appeal

[4] We next address plaintiff's argument on appeal. He argues that the trial court erred by granting defendant's motion for summary judgment as to plaintiff's unfair claims settlement practices and unfair and deceptive trade practices claims. After careful review, we agree.

In his amended complaint, plaintiff alleged that defendant engaged in an unfair or deceptive trade practice under N.C. Gen. Stat.

§§ 58-63-15 and 75-1.1. Chapter 75 of our general statutes provides a private cause of action for consumers. *Gray v. N.C. Insurance Underwriting Assoc.*, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000). Chapter 58 of our general statutes prohibits unfair methods of competition and unfair and deceptive acts or practices in the business of insurance and grants the Commissioner of Insurance the authority to enforce its provisions. N.C. Gen. Stat. § 58-63-10 (2007); *Gray*, 552 N.C. at 69, 529 S.E.2d at 682. Unfair claim settlement practices are among the activities prohibited by Chapter 58. N.C. Gen. Stat. § 58-63-15(11) defines unfair claim settlement practices, in relevant part, as:

> Committing or performing with such frequency as to indicate a general business practice of any of the following:
>
> * * *
>
> b. Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;
>
> * * *
>
> d. Refusing to pay claims without conducting a reasonable investigation based upon all available information;
>
> * * *
>
> g. Compelling [the] insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insured;
>
> h. Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled;
>
> * * *
>
> m. Failing to promptly settle claims where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage[.]

N.C. Gen. Stat. § 58-63-15(11) (2007). Although § 58-63-15(11) itself does not create a private cause of action, any "conduct that violates subsection (f) of N.C.G.S. § 58-63-15(11) constitutes a violation of N.C.G.S. § 75-1.1, as a matter of law, without the necessity of an ad-

MARTINI v. COMPANION PROP. & CAS. INS. CO.

[198 N.C. App. 39 (2009)]

ditional showing of frequency indicating a 'general business practice[.]'" *Gray*, 352 N.C. at 71, 529 S.E.2d at 683 (additional citation omitted). This Court extended *Gray's* holding to "the other prohibited acts listed in N.C. Gen. Stat. § 58-63-15(11)," holding that they "are also acts which are unfair, unscrupulous, and injurious to consumers" and can support a § 75-1.1 claim. *Country Club of Johnston County, Inc. v. United States Fid. & Guar. Co.*, 150 N.C. App. 231, 246, 563 S.E.2d 269, 279 (2002).

Plaintiff specifically alleges that defendant failed to conduct a reasonable and complete investigation before denying plaintiff's claim—indeed, before speaking directly to plaintiff—and continuing to deny plaintiff's claim after speaking with plaintiff and receiving an alternate explanation as to why the Montero was driven to the airport. Plaintiff also alleges that defendant failed to follow its claims handling guidelines. These allegations raise genuine issues of material fact, and thus it was improper for the trial court to resolve plaintiff's Chapter 75 claim by summary judgment.

Accordingly, we hold that the trial court erred by granting partial summary judgment in favor of defendant as to plaintiff's claim for unfair and deceptive trade practices pursuant to § 75-1.1. We remand this case to the trial court for a trial on the merits of plaintiff's unfair and deceptive trade practices claim.

Affirmed in part; reversed and remanded in part.

Judge BRYANT concurs.

Judge STEELMAN dissents in part and concurs in the result in part by separate opinion.

STEELMAN, Judge, dissenting in part and concurring in the result in part.

I must respectfully dissent from the majority decision in the appeal of defendant and concur in the result only in the appeal of plaintiff.

## I. Summary Judgment

### A. Standard of Review

Our appellate courts review a trial court's ruling on a motion for summary judgment *de novo*. *Forbis v. Neal*, 361 N.C. 519, 524, 649

S.E.2d 382, 385 (2007). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2007).

> Summary judgment may not be used to resolve factual disputes which are material to the disposition of the action. Nor may summary judgment be used where conflicting evidence is involved. Where there is any question regarding the credibility of plaintiffs' evidence . . . or if there is a question which can be resolved only by the weight of the evidence, summary judgment must be denied.

*Federal Paper Board Co. v. Kamyr, Inc.*, 101 N.C. App. 329, 333, 399 S.E.2d 411, 414 (internal citations omitted), *disc. review denied*, 328 N.C. 570, 403 S.E.2d 510 (1991). "The factual truth must be clear and undisputed for summary judgment to be granted." *Camby v. Railway Co.*, 39 N.C. App. 455, 459, 250 S.E.2d 684, 687, *disc. review denied*, 297 N.C. 298, 254 S.E.2d 919 (1979).

## B. Analysis

### 1. Defendant's Appeal

The issue in defendant's appeal is whether the trial court properly granted summary judgment holding that the insurance policy for the Toyota Sequoia (Toyota) provided underinsured motorist coverage for the Mitsubishi Montero (Mitsubishi) that plaintiff was operating at the time of the accident. Only if the Mitsubishi was a "temporary substitute" for the Toyota is this coverage applicable.

At the summary judgment hearing, sharply conflicting evidence was presented by the parties. The trial court and the majority accept at face value the testimony of the Martinis that there was a brake problem with the Toyota, and that is the reason that plaintiff operated the Mitsubishi on the morning of 10 January 2005. The majority further engages in the rank speculation that it is "reasonable to assume that Mrs. Martini did not immediately have the [Toyota] serviced because her husband had broken his neck in a car accident that morning." The evidence was that the Toyota was not taken in for servicing until over two months after the accident. This is not the appropriate standard to be applied on a summary judgment motion. Rule 56 requires that there be "no genuine issue as to any material

fact" before summary judgment can be entered. Whether the Mitsubishi was a temporary substitute vehicle as defined by the insurance policy and our case law was the material issue of fact in this case.

Brooks Allen (Allen), an adjuster for defendant, testified by way of deposition that he spoke to plaintiff's wife on 1 March 2005 concerning the accident. Allen's contemporaneous claims log note states:

> Ms. Martini called. Husband was on his way to the airport to go to a business meeting when the accident occurred. *He was driving the personally owned Mitsubishi, rather than a business owned Toyota, as the Toyota is much newer and nicer. So he did not want to leave it in the parking lot at the airport. Toyota is garaged at home and was available for use that day.*

(Emphasis added). Based upon this conversation, defendant denied plaintiff's claim.

On 21 March 2005, George Williams, plaintiff's insurance agent, left Allen a voice message stating that he had spoken with plaintiff and he had asserted that he was driving the Mitsubishi "because the brake light had come on in the Toyota the night before the accident" and he wanted to "have it checked out[.]" Williams further stated that plaintiff's wife knew this to be true during their first conversation, but did not think it was important. On 7 April 2005, Allen interviewed plaintiff by telephone, and recorded the conversation. After discussing the accident, plaintiff's injuries, and the amount of medical bills, Allen asked plaintiff "Okay, why were you driving the Mitsubishi at the time of the accident?" Plaintiff responded:

> I, there was, it was a Sunday afternoon, I believe, . . . my wife took one of my sons either to soccer or baseball practice, and I had noticed that the brake light was on, and in discussion that evening she just mentioned that that was on, and I was heading to the airport, so I said I would, because of that, I'll just take that, the other vehicle.

Plaintiff went on to state that he and his wife continued to use the Toyota for "several weeks" and that "the brake light did go off."

The deposition of plaintiff's wife tended to show that they owned three vehicles, a Mitsubishi, a Toyota, and an Audi. Plaintiff's wife primarily drove the Mitsubishi and plaintiff drove the Audi for personal use and the Toyota for business purposes. On the morning of the acci-

dent, both the Toyota and the Audi were parked at their residence. Plaintiff's wife drove the Toyota to the hospital that morning because the Audi was "a stickshift" and she "[didn't] like to drive it." Later that day she drove the Toyota back home without any problems. Plaintiff's wife testified that there were no mechanical malfunctions or difficulties associated with the Toyota aside from the brake light being activated. Plaintiff's wife further testified that she did not take the Toyota to be serviced until 24 March 2005, more than two months after the accident. The invoice from the National Tire & Battery Store on that date listed the following under Item Description: "Wheel Balance," "Tire Rotation," "Brakes Check & Advise" and "Patch & Balance Tire Repair[.]" Plaintiff's wife was only charged for the tire repair at a rate $19.99. When asked if she recalled telling Allen that the Mitsubishi was nicer than the other cars she owned, she responded:

> Well, the nicest car at our house would have been the Audi TT. And if I would have said—I wouldn't have said that the Toyota is newer or nicer than the Mitsubishi, because the Mitsubishi was actually newer. That just wasn't true. And I am thinking that there's confusion there with the Audi, that—that he thinks that I was talk—that—I had been talking about the Audi, not the Mitsubishi.

Based on the above-recited testimony before the trial court, there was a genuine issue of material fact as to why plaintiff operated the Mitsubishi on the morning of the accident. The resolution of this issue requires the assessment of the credibility of the witnesses and the weighing of the testimony. This is a task for the trier of fact and not for the court upon a motion for summary judgment. Since neither party requested a jury trial, the trial court should have heard the evidence, and entered a judgment containing findings of fact and conclusions of law. N.C. Gen. Stat. § 1A-1, Rule 52 (2007); *Federal Paper Board Co.*, 101 N.C. App. at 333, 399 S.E.2d at 414; *see also Craddock v. Craddock*, 188 N.C. App. 806, 813, 656 S.E.2d 716, 721 (2008) ("The *Capps* reminder still holds true, as the trial judge may not assume the role of trier of fact too soon.") (citation omitted)); *Capps v. City of Raleigh*, 35 N.C. App. 290, 292, 241 S.E.2d 527, 528-29 (1978) ("[T]he Supreme Court and this Court have emphasized in numerous opinions that upon a motion for summary judgment it is [not] part of the court's function to decide issues of fact but solely to determine whether there is an issue of fact to be tried. Despite our frequent reminders, we find that some of the trial judges continue to treat the motion for summary judgment as a hearing upon the merits before

the court without a jury where the judge becomes the trier of the facts." (internal citation and quotation omitted)).

The insurance policy states "[t]he covered 'auto' must be out of service because of its breakdown, repair, servicing, 'loss' or destruction." North Carolina appellate courts have interpreted similar provisions with varying results based upon the specific facts of each case as is correctly articulated in the majority opinion. *See, e.g., Insurance Co. v. Insurance Co.*, 279 N.C. 240, 182 S.E.2d 571 (1971); *Ransom v. Casualty Co.*, 250 N.C. 60, 108 S.E.2d 22 (1959); *Maryland Casualty Co. v. State Farm Mutual Ins. Co.*, 83 N.C. App. 140, 349 S.E.2d 307 (1986). The general rules that can be gleaned from this prior case law are that the vehicle covered under the insurance policy need not be withdrawn from use because of some mechanical defect, it may also be unavailable due to body work in order for another vehicle to qualify as a substitute. *Insurance Co.*, 279 N.C. at 251, 182 S.E.2d at 578; *Maryland Casualty Co.*, 83 N.C. App. at 142, 349 S.E.2d at 308-09. "[H]owever, the initially covered vehicle must nonetheless be actually withdrawn from use." *Maryland Casualty Co.*, 83 N.C. App. at 142, 349 S.E.2d at 309.

No reasonable interpretation of the policy provision in the instant case would conclude that the Toyota was "out of service because of its breakdown, repair, servicing, 'loss' or destruction" because plaintiff did not want to leave it in the parking lot at the airport because it was "newer and nicer" than the Mitsubishi. If the trial court believed Allen's testimony as to why plaintiff drove the Mitsubishi to the airport, plaintiff would be excluded from coverage pursuant to the underinsured motorist insurance policy. On the other hand, the trial court could determine that plaintiff drove the Mitsubishi on the morning of the accident because the Toyota's brake light had activated. If the trial court made such a finding, the next question the trial court must resolve is whether the Toyota's activated brake light caused the vehicle to be "out of service because of its breakdown, repair, servicing, 'loss' or destruction." This ruling will depend upon the evidence plaintiff presents at trial. In making this determination, the trial court should consider the purpose of the typical substitution provision:

> the purpose of the provision is not to narrowly limit or defeat coverage, but to make the coverage reasonably definite as to the vehicles the insured intends normally to use, while at the same time permitting operations to go on should the particular vehicles named be temporarily out of commission, thus enabling the insurer to issue a policy upon a rate fair to both insured

and insurer, rather than one at a prohibitive premium for blanket coverage of any and all vehicles which the insured might own or operate.

*Ransom,* 250 N.C. at 63, 108 S.E.2d at 24. If plaintiff presents evidence at trial establishing by the greater weight of the evidence that the Toyota was "out of service" on the day the accident occurred, the Mitsubishi would be a temporary substitute vehicle and there would be underinsured motorist coverage under the policy for the Toyota. If plaintiff fails to present such evidence, coverage would be precluded.

Because the resolution of this factual dispute is outcome determinative, it may not be resolved at summary judgment. *Federal Paper Board Co.,* 101 N.C. App. at 333, 399 S.E.2d at 414. The trial court's entry of partial summary judgment in favor of plaintiff was improper.

### 2.  Plaintiff's Cross-Appeal

The issue in plaintiff's cross-appeal is whether the trial court properly granted summary judgment holding plaintiff failed to show defendant committed unfair settlement practices and unfair and deceptive trade practices pursuant to N.C. Gen. Stat. §§ 58-63-15(11) and 75-1.1.

I disagree with the majority's assertion that the allegations in plaintiff's unverified complaint are sufficient to raise genuine issues of material fact. *See Tew v. Brown,* 135 N.C. App. 763, 767, 522 S.E.2d 127, 130 (1999) ("[T]he trial court may not consider an unverified pleading when ruling on a motion for summary judgment." (citations omitted)), *disc. review improvidently allowed,* 352 N.C. 145, 531 S.E.2d 213 (2000); *Venture Properties I v. Anderson,* 120 N.C. App. 852, 855, 463 S.E.2d 795, 797 (1995) (holding that "[s]ince [the] defendant's pleadings were unverified, the trial court acted properly in refusing to consider them" when granting the plaintiff summary judgment (citations omitted)), *disc. review denied,* 342 N.C. 898, 467 S.E.2d 908 (1996). In the instant case, a genuine issue of material fact was raised by conflicting evidence in the parties' depositions, answers to interrogatories, and affidavits as to why plaintiff operated the Mitsubishi on the morning of the accident. Whether defendant violated N.C. Gen. Stat. §§ 58-63-15(11) and 75-1.1 is largely contingent upon the resolution of this factual dispute, which would dictate whether the Mitsubishi was a temporary substitute vehicle. Once the trial court has properly determined whether or not plaintiff is provided coverage under the underinsured motorist insur-

**IN RE C.M. & M.H.M.**

[198 N.C. App. 53 (2009)]

ance policy, it can then determine whether defendant conducted a reasonable and complete investigation before denying plaintiff's claim and whether defendant was justified in continuing to deny plaintiff's claim after the 7 April 2005 conversation. Because plaintiff's cross-appeal also depends upon a factual dispute which is material to the disposition of the action, partial summary judgment in favor of defendant was improper. Therefore, I concur in the result reached in the majority opinion.

I would hold the trial court erred by granting partial summary judgment in favor of plaintiff as to the coverage issue and granting partial summary judgment in favor of defendant as to plaintiff's claim for unfair settlement practices and unfair and deceptive trade practices pursuant to N.C. Gen. Stat. §§ 58-63-15(11) and 75-1.1. This case should be remanded for a trial on the merits.